ALEXANDER POWELL *vs.* WM. L. BRANDON, Administrator, &c.

The rule in Shelly's case, in common with the other principles of the common law, forms a part of the judicial system of this State, and will be enforced, unless repealed by statute.

The proviso to section 24 of the act of 13 June, 1822, Hutch. Code, 609, relates exclusively to conveyances or devises of real estate, and cannot, therefore, affect the application of the rule to a conveyance or devise of slaves.

By the common law interpretation, the words "heirs, issue, heirs of the body, offspring," &c., were held, in their appropriate signification, to embrace any heirs of the given description, collectively, as a class of persons, unless there was a direct intention plainly and clearly expressed to the contrary.

By the 26th section of the act of 13 June, 1822, Hutch. Code, 610, the converse of this rule, in the class of cases mentioned in the statute, has been established; therefore, where estates are limited to take effect upon the death of a party "without heirs or heirs of the body, or without issue or issue of the body, or without children or offspring, or descendant or other relative," these words shall be interpreted to mean "heirs, &c. living at the death of the party, or born to him within ten months afterwards, unless such limitation be otherwise expressly and as plainly declared on the face of the deed or will directing it."

If, on the face of a deed or will, the intention is plainly and expressly declared, that these words shall not have the meaning affixed to them by the statute, then they will receive the common law definition, in accordance with such expressed intention.

The rule in Shelly's case, so far at least as personal property is concerned, has not been entirely abolished in this State; but the rule still exists, and will be applied in every case where it expressly or as plainly appears, from the instrument creating the estate, that it was the grantor's intention, by the use of the words "heirs, heirs of the body, issue," &c., to designate a class or denomination of persons to take the inheritance in succession from generation to generation in the character of heirs of the ancestor.

A devise which directs a trustee to put the *cestui que trust* into possession of the estate, and to "permit him to have, occupy, work, and enjoy the same during his natural life, and in trust after his decease, to put and continue in possession of the estate the lineal descendants of the *cestui que trust* to the latest posterity," plainly and clearly shows, on its face, that the heirs of the body of the *cestui que trust* were to take the inheritance from generation to generation, in and by virtue of their character as lineal descendants of the *cestui que trust;* and such a devise of slaves is within the rule in Shelly's case, and would vest an estate tail to the first taker, but for the restriction contained in section 24 of the act of 13 June, 1822, Hutch. Code, 609; and under the operation of that statute, vests in him a fee simple.

Powell v. Brandon.

A limitation over of personal property, to take effect after the death of a party, without "heirs, or heirs of the body, issue," &c., subject to no other restriction, is void, if it clearly appears from the instrument that, by these words, an indefinite failure of such heirs or descendants was intended.

A devise of slaves in trust for A. for life, and after his death in trust "for his lineal descendants in the remotest posterity," and "on failure of lineal descendants, then in trust for the heirs generally" of the testator, the limitations over are too remote, and, therefore, void; and the whole estate is vested in A., the first taker.

On appeal from the probate court of Wilkinson county; Hon. Francis Gildart, judge of the probate court.

The proceedings in this case were instituted by petition or bill in probate court of Wilkinson county. The petition of Alexander Powell states:

1. That Matthew N. Brandon departed this life July 23d, 1841, having made his will, with a codicil, which were probated January, 1842; that W. L. Brandon was appointed administrator, with will annexed. Testator left a valuable estate of land and negroes; that personal estate was appraised at $15,073.50; that the personal estate was sold, by order of probate court, for $10,063.50, as per account sales rendered at January term, 1843; that, at September term, 1843, the estate was reported insolvent, and commissioners to audit claims appointed.

The real estate was sold for $10,570; that the commissioners of insolvency reported in favor of debts to amount of $61,-542.55.

The petitioner's claim, to amount of $4,136.84, was allowed.

2. That the testator, at the time of his death, was the owner of large number of slaves, which came, on his death, to his administrator Brandon, but which were not included in his inventory, and sets out their names, and are still in defendant Brandon's possession.

That defendant refuses to administer them, for the benefit of creditors, but is using them for his own profit.

That the cotton crop of 1842 amounted to 198 bales; was shipped by the administrator to Liverpool; that the administrator has not reported the sales.

Prayer is for an additional inventory of slaves not included

in the first, an account of the hire of said slaves, and also of the cotton crop.    Petition sworn to.

Exhibits of the appraisement, inventory accounts, sales of personal estate, &c., report of commissioners of insolvency.

The answer of Brandon, administrator, admits the history of the administration to be as stated in the petition; that it is true, testator, at his decease, was in possession of the slaves named in petition, and not included in the first inventory.

But insists that testator only had a life estate in the slaves, under the will of Gerard Brandon, his father; makes an exhibit of said will.   The terms of the will relied upon are, a devise of all testator's lands and negroes to Gerard C. Brandon, Sarah Brandon, and James Smith, in trust, to be delivered to the said Matthew N., to have, possess, occupy, work, and enjoy said lands and negroes; and to receive the rents, issues, and profits to his sole and separate benefit during his natural life; and in trust, after the decease of the said Matthew N., to put and continue in possession of said lands and negroes the lineal descendants of said Matthew N. to the remotest posterity, with the same privileges which the said Matthew N. should have had during his life; and, on failure of lineal descendants of said Matthew N., then in trust to the heirs generally of the testator, with the same privileges."

That Matthew N. Brandon died without children; and that William L. and Gerard C. and others are the heirs general of said testator; and that said defendant is in possession, holding said slaves for himself and co-heirs under the will.

An amended petition, claiming that a debt of petitioners might be paid out of the newly discovered property, was filed, as also defendant's answer, and a deposition taken to prove the debt; then on p. 41, the will of M. N. Brandon, by which he bequeathes the uninventoried negroes to his widow.

Upon this condensed state of case, the court below, on final hearing, dismissed the petition absolutely, and adjudged that Powell should pay to defendant Brandon all costs, &c.

*H. F. Simrall,* for appellant.

The object of the testator clearly was to perpetuate the

property in M. N. Brandon and his issue; and if the perpetuity should fail for want of issue, then to the right heirs of the testator. Now, to fully effectuate this object, M. N. Brandon and his issue must have an estate tail. If they had a fee simple, then the property could have been alienated; and thus the limitation to those in remainder could have been destroyed. But by making Mat. Brandon tenant in tail, and his issue, if he should have any, like tenants, this property was inalienable; and therefore the tenant in tail could not destroy the estate in remainder.

The testator intended, that all persons who could claim, or come under the description of lineal descendants of Mat. Brandon, should take. They were to take in virtue of their descent from his body; in virtue of inheritable blood derived from him. Now, if it be construed that Mat. Brandon had but a life estate, upon his death that estate was determined, was gone, and there was nothing which could be transmitted to a lineal descendant, and therefore the limitation for the benefit of such descendants would have nothing to operate upon, and must fail. But just here the rule in Shelly's case interposes, and enlarges the life estate of Mat. Brandon into an estate of inheritance; constitutes him tenant in tail, and thereby enables him to transmit by inheritance to lineal descendants. For a definition and description of the rule, see Preston's Estates, 263, 265. The following is one of the definitions: —

" In any instrument, if a freehold be limited to the ancestor for life, and the inheritance to his heirs, either mediately or immediately," " the first taker takes the whole estate; if to the heirs of his body, he takes a fee tail; if to his heirs, a fee simple." To apply this rule to the will under discussion, the freehold is limited to Mat. Brandon for life, and his lineal descendants are to take to the remotest posterity. The inheritance, therefore, is limited to heirs descending from his body; and that excluding his heirs general. The estate is one of entail, and the first taker, Mat. Brandon, takes the " whole estate," which is an estate tail; and makes him, therefore, a tenant in tail. The very principle of the rule is, that the heirs are to have the inheritance, quatinus they are the heirs of the

ancestor. The rule requires that the same instrument that creates the freehold in the ancestor, should contain the limitation for the heirs. It further requires that the estate of the ancestor should be of the same character as the estate limited to the heirs, both legal, or both equitable. Preston, 265.

In the will, the same language used to describe the estate to Mat. Brandon, are used to describe the limitation for his lineal heirs; therefore both estates are of the same character; and the merger which the rule in Shelly's case .works invested Mat. Brandon with his life estate, and the estate of inheritance in his heirs lineal. So that he held the " whole estate."

The rule extends equally to legal estates, to limitations of use and limitations of trust, to copyhold as to freehold lands and tenements, and to land held for life or lives, and subject to a *quasi* entail. It extends to all sorts of instruments by which gifts or limitations of estate can be made either at law or in equity, including limitations in surrenders of copyhold lands. Preston, 288.

When the limitation is to the heirs of the body, (in this will, lineal descendant is but another name for heir of the body,) the rule will be applicable; and such heirs cannot be entitled otherwise than by descent. Preston, 290. By the common law, heirs of the body are part of the ancestor.

Shelly's case (from which the rule is deduced) was this : A fine was levied by a man to the use of himself for life ; remainder to the use of the heirs male of his body lawfully begotten ; and it was determined that the tenant for life took an estate tail. Here, it will be observed, the estate was one in use or trust. Preston, 347, 364.

In case of limitation to A. and the heirs of his body, and in case A. died before 21, or without issue, then over to other parties, it was held, that A. took an estate tail by force of the limitation to the heirs of his body. Preston, 372. The fact that A. died without issue would make no difference.

But I contend, also, that limitations of trusts and uses are governed by the same rules as similar limitations of legal estates. In cases of trusts executed, there is no sort of difference. Preston, 380.

If the trust is executory, requiring a new conveyance to perfect it, then the rules in Shelly's case do not apply. But where the trust is executed, it applies as uniformly as it does in legal estates. In trust estates, the mere circumstance that the Mat. Brandon's estate is for the express period of his life, or that the life estate is to be a separate estate, or that trustees are substituted to support contingent remainders, or that the heirs shall take by purchase, will not prevent the operation of the rule, and convert " heirs " into purchasers. See Preston, Estates, 382.

It was mainly relied upon by defendant's counsel, that the rule in Shelly's case does not apply to this will, because the trustees have something to do, and that something is to uphold the contingent remainder to the right heirs of the testator. Now the authority last referred to expressly declares, that the intervention of such trustees to uphold a remainder, does not exempt the estate from the operation of the rule.

In the case of *Austin* v. *Taylor*, Preston, Estates, 388 : " The testator gave certain lands to trustees and their heirs, among other trusts, upon trust for P. for life ; remainder to trustees to preserve contingent remainders ; remainder to heirs of the body of P.; remainder to testator's right heirs; and then directed the trustees to buy land with residue of personal estate, and to hold the same subject to the like estates, &c., trusts as the above.

It was ruled, that P. was tenant in tail; that his heirs took by inheritance, and not by purchase, notwithstanding the trustees were required to uphold the remainders. It was insisted in this case, that the rule should not be applied to the land directed to be purchased, upon the ground that this trust was executory. The land was yet to be bought by the trustees, and something was required for them to do. But the Lord Keeper was of opinion, " that in the case of imperfect trusts only could the court of chancery make a different construction from a legal limitation." Nothing was left to the trustees to be done, but to buy the land. The testator had declared the uses of the land when purchased.

It is not pretended that the trusts created by Brandon's will are executory. They are fully executed. But as additional authority, Mr. Justice Buller has ruled, that the intervention of

trustees to uphold remainders is not sufficient to turn words of descent into words of purchase. Preston, Estates, 275.

But this point cannot avail the defendant in this suit, because, 1st, the will does not make it the duty of these trustees to uphold the remainder to testator's right heirs, no words in his will being used devising the estate to them for that purpose, as will be found in all the cases to which I have referred; and, 2d, the statute of this State repeals the common law in this particular in express words; and, therefore, the whole argument based upon the necessity of their existence falls to the ground. But, thirdly and conclusively, the moment that the testator died, the statute of uses, of this State, vested in Mat. Brandon as full a legal seizin of the property as the trustees had; and the rule in Shelly's case having enlarged his life estate into a fee tail, and our statute abolishing entailments interposing, cut off the common law disabilities of the tenant in tail, raised his estate into a fee simple, and thereby, by operation of law, defeated the remainder to the right heirs of the testator. For the very moment that Mat. Brandon became tenant in fee simple, he had a perfect title. A fee simple comprehends every less estate; and, dying intestate, his fee simple title would descend to his heirs at law, or his executor, as the case might be; and, therefore, those claiming in remainder as testator's right heirs, never could take.

With a few desultory references, I will close. The rule in Shelly's case has been incorporated into the American jurisprudence. 4 Kent, 229, and notes. Where words in a will create an estate tail in real property, they would vest the absolute property in chattels, (same authority, note;) a bequest of chattels to A. for life, remainder to A.'s heirs of his body, vests in A. an absolute property. 4 Kent, 226, 230; 1 Day, 300. 1 Dallas, 47, supports fully the preceding views. The court is referred to 4 Kent, 214 to the close of the chapter, for a lucid and full discussion of the whole doctrine. The rule in Shelly's case, when applied to personal property, gives to the first taker an absolute title. 1 McCord, Ch. Rep. 60. So in S. Carolina, 1 Hawk. 163; Maryland, 4 Harr. & Johns. 431; New York, 2 Johns. Cases, 384; 7 Met. 172; 4 Pick. 205; 2 Wash. 9.

Let us now attend to the devise over to the right heirs of the testator, in case of failure of issue or lineal descendants of M. N. Brandon. It will not be disputed that a devise over of a chattel after an indefinite failure of issue, is too remote, and therefore void at the common law; and the vast learning which is accumulated in the books on this subject is not so much to set forth the doctrine just stated, as to determine whether the testator, or grantor, as the case might be, intended the devisee or grantee over to take after the failure of issue living at the time of the death, (which would be good,) or a general and indefinite failure of issue. And the very decided preponderance of authority is, that the dying without issue, or lineal descendants, does, in the case of a chattel or freehold, mean an indefinite failure of issue ; and so is *Moffatt* v. *Strong*, 10 John. 12; 8 Wheat. 495 ; 1 Binn. 546.

The rule of the common law is, that a dying " without issue," or " lineal descendants," means an indefinite failure of issue, and that a devise over is void for uncertainty, and as being too remote. So held by Supreme Court of New York after reviewing the cases in *Anderson* v. *Jackson*, 16 Johns. 409 ; *Patterson* v. *Ellis*, 11 Wendell, 259; and that it matters not whether the subject be a chattel or land. 5 Paige, 514. So also, 2 Atkyns, 308 ; 1 P. Williams, 198, 584; 1 Bro. 188; 2 Fearne, by Powell, 259; 6 Brown, P. C. 309 ; 3 P. Williams, 258; *Polk* v. *Farris*, 9 Yerger, 207 ; *Booker* v. *Booker*, 5 Humph. 508. In *Barlowe* v. *Slater*, 17 Vesey, 479, it was held that such words must always bear the meaning of an indefinite failure of issue, unless other words restrained or controlled them to same effect. 1 Paige, Ch. Rep. 345; *Royall* v. *Eppes*, 2 Mun. 479; Cameron & Nor. Rep. 202 ; *Sutton & wife* v. *Wood*, fully sustaining the rule. *Keating* v. *Reynolds*, 1 Bay, Rep. 80 ; *Jones* v. *Rice*, 3 Desaus. 165 ; *Betty* v. *Moore*, 1 Dana, 237 ; *Scott, Ex'r*, v. *Prince*, 2 Ser. & Rawle, 63, 64. The question in South Carolina may still be an open one, as shown by a review of the cases in that State, in *Newell* v. *Newell*, 9 S. & M. 68–70. But that the common law rule is as stated, it seems, is evident from the statute of this State upon the subject of contingent limitations. Hutch. Code, 610, 24. Let us see what effect,

if any, this section of the statute, as connected with § 24, on previous page, has upon Gerard Brandon's will. The latter section abolishes estates tail, or raises them to the dignity of "fee simple;" provided that "lands" may be conveyed or devised to a succession of donees then living, and the heir of the body of the remainder. The "proviso," it is worthy of note, does not include " chattels."

The proper reading of the 26th section, it is submitted, is that it provides and applies an arbitrary rule of construction, as to what is meant "by the dying without issue, or issue of the body, or without children, offspring, or other descendant," &c.; for it proceeds, such limitation shall be "held and interpreted" a dying without such issue, descendant, &c., living at the time of his or her death, or born in ten months thereafter, unless the intention of such limitation " be otherwise expressly and plainly declared on the face of the deed or will creating it." If the court will pause upon this section, — re-read it, — its language will be found to be peculiar, but still admirably adapted to declare the mind of the legislature.

The object is not to introduce and make lawful limitations, upon contingency not theretofore allowed, for it is placed in juxtaposition to sections freeing property from the confinements of entailment. But its purpose was to introduce a certain and uniform rule of construction to be applied by the tribunals in passing upon wills and deeds. The section does not even say that a limitation over, upon a person's dying "without issue living at the time of the death," shall be good, — and why? because such limitation was already good at the common law, (and I have already said that it did not intend to authorize a new class of limitations). The common law had, by great uniformity in the decisions, declared that the words "dying without issue," meant an indefinite failure of issue, and not issue living at the time of the death.

The section, then, merely repeals the construction which common law tribunals had placed upon these words, and substituted a legislative or statutory construction; which is, that such words shall be " held and interpreted" as a dying without issue at the time of his or her death, or born " ten months after,"

unless, &c. The common law is in force in this State. The common law construction of a will, limiting property over after the death of a person without issue was, that the words meant a general and indefinite failure of issue, and the limitation was too remote, and, therefore, void. But the common law also was, that such limitation, made to depend upon a dying without issue living at the time of the death, was not too remote, but was good. The legislature knew the old law, and therefore provided that the dying without issue should no longer receive the common law interpretation, " unless the intention of such limitation be otherwise expressly and as plainly declared on the face of the deed or will creating it." To paraphrase this last clause, it would read, — that if the testator plainly or expressly shows, by the terms of his will, that he means an indefinite failure of issue, and not issue living at the time of the death, then this legislative interpretation shall not apply, but the will must be construed according to the intention of the testator, and the common law consequence of such limitation applied.

. This view of the statute, it seems to me, will be found to be sustained by reference to the decisions of this court. The first case, *Carroll* v. *Remich et al.* 7 S. & M. 804, was decided according to the law of Tennessee, where the instrument was made, and where the common law, unchanged by statute, prevailed; and this decision is in conformity to what has been previously shown to be the common law. *Newell* ∴ *Newell,* 9 S. & M. 66, was for the same reason decided in conformity to what was supposed to be the law in South Carolina. The case of *Kirby et al.* v. *Calhoun,* 8 S. & M. 470, gave a construction to our statutes, and sustained the devise over as a good contingent limitation within the statute.

The words of the devise are, " to my said daughter and the heirs of her body; provided, nevertheless, should my said daughter depart this life without heirs of her body," then over, &c. " to my children and grand-children who shall be alive at my daughter's decease." This is a very clear case for the interposition of the legislative interpretation of which we have spoken; and that is, that the dying of the daughter without issue

of her body, shall be deemed and held issue living at the time of her death, or born ten months thereafter." For there is nothing upon the face of the deed which plainly indicated a different or contrary intention. There was nothing which indicated an indefinite failure of issue, by express and plain terms. And it is upon this very ground that the will of Gerard Brandon differs *toto cœlo* from the deed in *Kirby* v. *Calhoun;* for Brandon's will does " expressly and plainly " upon its face and by its words declare that the limitation over to the right heirs of the testator shall not vest, until after there has been a failure of lineal descendants to the remotest posterity. The provision is, that after M. N. Brandon's death, in trust to permit his lineal descendants to the " remotest posterity " to enter, possess, and enjoy upon the same terms of M. N. Brandon. Now the mind cannot conceive of words more expressly and plainly indicating an indefinite failure of issue, and not issue living at M. N. Brandon's death, than " lineal descendants to the remotest posterity; " for his remotest posterity might not fail until the crack of doom, and until there was this failure, thus remote, the limitation over should not vest.

The limitation over, in the section under review, clearly refers to the " estate " alone, and not to a class of persons who may enjoy it. Now the limitation over to the right heirs of the testator, upon the failure of M. N. Brandon's descendants becomes, under this will, precisely the same sort of estate given to Mat. Brandon and his lineal descendants. The language of the will is, " then in trust for the heirs generally of the said Gerard Brandon, with the same privileges." The trusteeship of this property in the executors of the will, is perpetual; it does not terminate at Mat. Brandon's death; it is appointed to run with M. N. Brandon's lineal descendants to the remotest posterity, and failing descendants, it then goes along the line of heirship, with testator's heirs generally, " with the same privileges; " that is, to permit these heirs during life to enjoy this property, and their lineal descendants after them, to remotest posterity. Here is a fee tail in this property created in the " heirs generally of testator;" not, however, to vest until the termination of the " fee tail estate " in M. N. Brandon and his lineal descend-

ants." If the court sustains this limitation over, is it not clear that the property has but just entered upon a second entailment, and that General Brandon, Mrs. Smith, the late Gov. Brandon, &c., &c., each takes his part of this property for life, their lineal descendants after them, each in his day and generation for life, &c. Did the legislature ever contemplate that this 26th section would tolerate such perpetual entailments, when by previous section it had abolished fee tails? What is meant by the words in the 26th section, if " any estate shall be limited," &c. ?

As to what is the meaning of " indefinite failure," as distinguished from issue living, see 16 Johns. Rep. 411, at the bottom of page. It is not proper to construe a will of this sort, say the authorities quoted, in reference to the state of things at the time of the death. But whether the limitation be good or not, must be determined from the terms of the will at the time made, or testator died. See case cited in Cameron & Norwood's Reports.

*S. S. Boyd,* on the same side.

*J. T. McMurran,* for appellee.

As to the validity of the will, I shall barely remark, that it was duly probated in the proper court in 1823, and there remains of record. Whether it ought to have been admitted to record, cannot be inquired into collaterally; and even if it could, prescription under our statute of limitations would bar the inquiry. After such a lapse of time, the court would presume every thing necessary to give it legal effect, if necessary. But if there is no will, the appellant has no claim, assuredly; for the negroes belonged to the estate of Gerard Brandon, and if Matthew N. Brandon's administrator has any right, it is derived from the will of Gerard, otherwise the negroes belong to the administrator, or estate of Gerard Brandon, the testator.

But to come to the main question, let me briefly state the points upon which I rely, to show that Matthew N. took but the usufruct for life, and that upon his death, without heirs of his body, or lineal descendants, the estate reverted through the trustee to the right heirs of testator.

Matthew N. Brandon never had any estate in the slaves, and, therefore, his lineal descendants, if he had had any, could not take as heirs. The whole property of the testator is conveyed or devised generally to trustees named, for the purposes expressed in the will; first, to deliver certain portions to the different children of the testator, and to permit each to enjoy the income thereof, to his or her exclusive use during life, and no longer; secondly, in trust, further, after the decease of the child, to put in possession of such land and negroes, the lineal descendants of such child to the latest posterity, with the same privileges; and, on failure of lineal descendants, in trust, in the third place, for the heirs generally of the testator. Now a conveyance, or devise to trustees, for special purposes, is senseless and inoperative, or no estate could vest in Matthew N., nothing but a claim in equity to the income for life; the same that Margaret and Elizabeth took.

Again. The trusts in this will are executory trusts, and as a class are exempted from the operation of the rule in Shelly's case. " The test of an executory trust is, that the trustee has some duty to perform; for the performance of which it is necessary the estate should be regarded as abiding in him." *Porter's Administrator* v. *Doly*, 2 Richard. Eq. R. 49–53.

Apply this principle to the trustees under this will. On this point, and as applicable to the general question as to the true construction and effect of the will, I refer the court to the case of *Tallman et al.* v. *Wood et al.* 26 Wend. R. 9–21.

Now if, as stated by the court in the case just cited, we are to look after the intent of the testator to be gathered from the language he has used in his will, there can be no more doubt in this case than in the one referred to. I respectfully ask the court to examine most critically and closely the language used and the different terms applied to the different clauses of this will, according as the testator intended the provisions to take effect; and it will be seen, that every provision is in harmony with the decisions, and certainly within the provisions of our statute, which I shall notice presently.

Thus, in the first provision, and also the second, to his daughters Margaret and Elizabeth respectively, he mentions, that

after their decease, the lineal descendants, and on the failure of such, then to his heirs generally, with the same privileges which his daughters had during life. By privileges he could mean nothing except the enjoyment and usufruct of the property to their sole and separate use. In these two clauses there is no limitations or conditions annexed, of a life estate or any thing else, as to the lineal descendants, or the heirs generally of the testator. Now, in the third provision, to his daughter Susan, to avoid repetition, the trustees are to deliver to her the slaves, &c., with the same privileges, conditions, and limitations before mentioned in respect to Margaret and Elizabeth, and their lineal descendants. Here it was necessary to add also the word " condition," to show that Susan took but a usufruct for life, and also the word limitations, that if there should be no lineal descendants of Susan when she died, this portion of the estate reverted. And thus we have the same language and these same terms in reference to all the other clauses regarding the testator's sons and daughters. But among the clauses, is one for the benefit of the " lineal heir or heirs " of his deceased son, Robert. And here, in providing for the lineal descendants of his deceased son, mark well the language; they are to be put in possession not for life, nor with any condition whatever, as Margaret and Elizabeth, and his other sons and daughters were, that is, a life estate; but the grandchildren of the deceased son have the property delivered to them, with the "same privileges and limitations " as before mentioned in respect to the lineal descendants of Margaret and Elizabeth. Now if the testator assigned a life estate to any of the lineal descendants, and so a life estate to each generation successively, to the last lineal descendant, (as counsel have and may contend,) it would have been so expressed, and most clearly would it have been so expressed in reference to the lineal heir or heirs of his deceased son, Robert. This provision would have specified that they were to have the usufruct for life, or that they took on the conditions that Margaret and Elizabeth did. But not so; these grandchildren take as the lineal descendants of the living sons and daughters of testator, and differently from the sons and daughters. Why, then, this distinction so carefully observed without an object?

Powell *v.* Brandon.

Every word of a will is to have effect, if possible, especially to sustain the will, and effectuate the intention of the testator. And the testator intended to place each of his children, and then their descendants, precisely on the same footing, as the will plainly shows.

The true construction of the will, then, according to the best examination I can give it, and according to my deliberate judgment, is, that Matthew Brandon had the possession and usufruct of the slaves for his lifetime, to his exclusive use; that if he had left an heir of his body, or lineal descendant, (which terms are precisely the same in meaning,) or had had one born to him within ten months after his decease, such descendant or descendants would have been put in possession by the trustees, and taken a fee tail, under the proviso in the twenty-fourth section, cited below, in my opinion; or if not, then a fee simple absolute. But there being no lineal descendant of Matthew N. at his death, the property immediately reverted, through the intervention of the trustees, to the heirs generally of the testator.

But I insist, that the words "lineal descendants" are not words of limitation, even according to the Shelly case. And this court would construe them words of purchase. The will comes clearly within the provisions of our statute. "That any person may make a conveyance or devise of lands to a succession of donees then living, and the heir or heirs of the body of the remainder man; and, in default thereof, to the right heirs of the donor in fee simple." Hutch. Code, 609, § 24.

And the other provision which I allude to would put the question beyond a doubt, if there were room for a doubt in this case. "Every contingent limitation, in any deed or will, made to depend on the dying of any person, without heirs or heirs of the body, or without issue or issue of the body, or without children or offspring or descendant or other relative, shall be held and interpreted a limitation, to take effect when such person shall die, not having such heir or issue or child or offspring, or other descendant, or other relative, (as the case may be,) living at the time of his death, or born to him within ten months thereafter, unless the intention of such limitation be otherwise

expressly and plainly declared on the face of the deed or will declaring it." Hutch. Code, 640, § 26.

This puts an end to the rule in Shelly's case, (and I think it was time;) and, in the language of Chancellor Kent, " sweeps away at once the whole mass of English and American adjudications on the meaning, force, and effect of such limitations. The statute speaks so peremptorily as to the construction which it prescribes, that the courts may not, perhaps, hereafter feel themselves at liberty to disregard its provisions." 4 Kent's Com. 280. " It is impossible not to feel relief at the final settlement in any of this litigious question by legislative enactment."

But this court has in its decisions regarded and carried out this provision of our law, and thus put an end to the mischief which it was intended to remedy. *Carroll* v. *Remich et al.* 7 S. & M. 798. But a more direct decision of this court is to be found in the case of *Kirby et al.* v. *Calhoun et al.* 8 S. & M. 462.

This decision settles finally, in this State, the proper construction of the provisions of the statute referred to, and covers this case. The effect of the statute, in the language of the court, is " to put an end to the numerous distinctions and almost endless refinements of the English law on this subject, and to furnish a rule of construction at once simple, obvious, and intelligible."

Thus, no language can be more strong and decisive than that of Chancellor Kent and this court, in regard to the operation and effect of the provision of the statute just cited. But if the court permit distinctions to be drawn and refinements to prevail to exempt provisions in deeds and wills from the benefit of the statute, in such cases as the present, the mischief intended to be remedied has not been remedied; and greater mischiefs and uncertainties must result in the endless refinements and subtle distinctions which would thus arise in construing the plain and peremptory and broad and comprehensive language of a remedial statute.

I will only add on this point, that, if counsel can produce a single respectable authority that any court of last resort, in construing and giving effect to this 26th section of the law on the subject, has decided that this section or a similar one in substance does not extend to and protect the clause of Gerard

Powell v. Brandon.

Brandon's will, so as to vest in Matthew N. any thing beyond a life interest or estate, I will admit that counsel have produced what I have been unable to find in my researches.

A very handsome decision, bearing an anology to this case in principle, will be found in *Tanner* v. *Livingston*, 12 Wendell, R. 83–90. A testator devises a tract of land to a son and his wife for life, and upon the death of the son and wife he devises the land to their heirs male, and to the heirs of the heirs male and their assigns forever, share and share alike. The son and his wife take only a life estate.

So, if there were any doubt as to the true construction of Brandon's will, it cannot arise regarding the usufruct or interest to Matthew N., being but for his life. There is no room for doubt as to the intent of the testator as to him; and if the testator did attempt to devise an estate to lineal descendants for life, through an indefinite succession of them, it would not affect the life interest to Matthew N. That would stand good as willed by the testator, and the first lineal descendant, (if he had left one,) would take, but that first lineal descendant would take a fee simple; he would not and could not take as heir of Matthew N., he would take by purchase under the will.

Again, the very agreement made by the heirs under their seals, regarding the will and carrying it out, would estop Matthew N. from claiming more than a life estate under the will. And the creditor of the estate can be in no better situation.

Let the will, then, be examined as a whole, and also in all its clauses and provisions; let no clause be construed by its own language, unconnected with the other clauses which are connected with it, or which throw light upon it, and assist in arriving at a just interpretation of the testator's meaning. Let us keep in view the cardinal rules on the subject; that the testator's intentions are the pole star to direct; that every word and sentence is to be carried into effect if possible : that the testator is to be presumed to have intended to observe the law in the devises and bequest he makes, and at the same time let us give full force and effect to the provisions of our statute, which I have commented on; and I am sure that there can be no reasonable doubt on any of the questions which have been discussed. I am sure that the court will come to the conclusion that the sons

and daughters of the testator had no interest of any kind beyond their lives, and thus leave in repose the rights of the family and all others under this will, to be enjoyed as understood and observed since the testator's death, with the exception of the present instance. 1 Hen. & Mumf. 240–303, Judge Lyon's opinion; *Murdock et al.* v. *Shackford*, 1 Brock. R. 131. The last case is a decision by Chief Justice Marshall.

*Davidson*, on the same side.

Mr. Justice YERGER delivered the opinion of the court.

In the year 1823, Gerard Brandon made his last will, which was admitted to probate in the county of Wilkinson. By it he bequeathed all his estate, real and personal, of every kind whatever, to three persons as trustees, in trust that they would immediately, after his decease, take possession of all his property, and " deliver to his daughter, Margaret Smith, certain land and slaves named therein, in trust to permit said Margaret to have, possess, occupy, work, and enjoy said land and slaves to her sole and separate benefit, during her natural life. And in trust, after the decease of said Margaret, to put and continue in possession of said land and slaves, the lineal descendants of the said Margaret to the latest posterity, with the same privileges which the said Margaret shall have had during life; and on failure of lineal descendants, then in trust for the heirs generally of the testator, with the same privileges." The will contains bequests in similar language, to all the children of the testator, and among other bequests is one in favor of Matthew N. Brandon, his son, in the following words: " Also, further in trust, as soon after my death as the debts of my son, Matthew N. Brandon, are paid, and they may deem it prudent and measurable, to deliver to said Matthew N. Brandon certain slaves and a tract of land named in the will, and put the said Matthew N. in possession on the same conditions, and with the same privileges and limitations as before mentioned in respect to said Margaret and her lineal descendants."

Matthew N. Brandon was put into possession of the property, and held the same during his life. He has died, leaving no lineal descendants. For the appellant, who is a creditor of

Powell v. Brandon.

Matthew N., it is contended that by the foregoing devise an estate in fee was bequeathed to said Matthew N. in the slaves, and that his creditors since his decease have a right to subject them to the payment of his debts. For the appellee it is argued, that Matthew N. had only an estate for life in the slaves, and as he died leaving no lineal descendant, that the same, by the provisions of the will, now belong to the heirs general of the testator, Gerard Brandon. The question thus presented is interesting and important, and throws upon the court the necessity of deciding, whether or not the celebrated rule in Shelly's case is in force in this State; and if so, whether it is applicable to the devise before us.

An ancient canon of the common law, regulating title to property, was announced by the English judges in the case of Shelly, decided in the 23d year of Elizabeth, and reported in 1 Coke, R. 104, in the following language: " When the ancestor, by any gift or conveyance takes an estate of freehold, and in the same gift or conveyance, an estate is limited, either mediately or immediately, to his heirs in fee or in tail, that always in such cases the heirs shall take by descent, and not by purchase." Fearne, in his work on Contingent Remainders, has defined in the following language "the rule in Shelly's case." Wherever the ancestor takes an estate of freehold and an immediate remainder is thereon limited in the same conveyance to his heirs, or his heirs in tail, such remainder is immediately executed in possession in the ancestor so taking the freehold, and, therefore, is not contingent or in abeyance; as an estate for life to A., remainder to the heirs of his body, this is not a contingent remainder to the heirs of the body of A., but an immediate estate tail in A. Fearne on Rem. 27, 33.

In the very able and lucid analysis of the rule by Preston in his work on Estates, he has given it the following clear and ample definition. " When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and afterwards in the same deed, will, or other writing, there is a limitation by way of remainder, with or without the interposition of any other estate, of an interest of the same quality, as legal or equitable, to his heirs generally, or his heirs of his body, by

31 *

that or some such name, and as a class or denomination of persons to take in succession from generation to generation, the limitation to the heirs will entitle the person or ancestor himself to the estate or interest imported by that limitation." 1 Preston on Estates, 264. The rule thus defined by Preston requires the concurrence of the following circumstances: —

1. The estate limited to the ancestor must be a freehold.

2. The remainder to the heirs generally, or heirs of the body, must be to them, as a denomination or class of persons to take in succession, and to whom the inheritance is limited in their character as heirs, and on account of that relationship to the ancestor.

3. The estate must be granted to the ancestor and the heirs by, under, or as a consequence of, the same instrument or writing.

4. The interest limited must be of the same quality; that is to say, it must be a legal estate to both or an equitable estate to both, not a legal estate to one and an equitable estate to the other.

Whenever the foregoing circumstances are found united in any conveyance, the rule of the common law will be found inflexible and invariable, that the ancestor takes the whole estate limited by the conveyance, the life estate and the inheritance uniting in the same person. In the language of Preston, " the estate of freehold attracts to the ancestor the estate imparted by the limitations to his heirs." 1 Preston on Es. 295. The rule thus announced is equally applicable to limitations of the legal estate, limitations of uses, limitations of trusts, and extends to all sorts of instruments by which gifts or limitations of estate can be made, either in law or equity. 1 Preston on Es. 289; Fearne on Rem. 79. The rule has been applied as universally and without exception to limitations of personal as of real estate; no distinction whatever having been taken between them by the English courts, or the courts of this country. *Dow* v. *Lord Chatham,* 1 Madd. 288; 1 Merivale's Rep. 278. *Atkinson* v. *Atkinson,* 3 P. Wms. R. 258. Also, see 1 P. Wms. 298, and Fearne on Rem. 463. Various attempts have been made to trace this rule to its source, and

to assign the reason for its establishment. What success has attended these investigations it is not necessary to determine. By some, the origin of the rule has been ascribed to the nature and policy of the feudal system. Preston says, "it was framed in order to give the inheritance to the ancestor, so that the heirs might take by hereditary succession in a course of descents, that the lord might have the fruits of his seignory, the most valuable of which was wardship, of which right the lord would have been deprived, if the heir had been introduced as tenant by purchase instead of by descent." 1 Preston on Estates, 296.

By others, and among them Sir William Blackstone may be named, the establishment of the rule has been ascribed to a principle directly antagonistic to the entire spirit of the system of feuds; having been established, as they allege, in order to facilitate the alienation of estates, by giving the power and control of the inheritance to the ancestor one generation sooner than it would otherwise have been alienable. But whatever may have been the cause or origin of the rule, the fact of its existence in the manner and to the extent before stated, is entirely beyond question or dispute.

The argument has frequently been urged, by those who assign a feudal origin to the rule, that inasmuch as the feudal system has been abolished, the reason for the rule has ceased; and, therefore, the rule itself should be abrogated. However cogent this argument may be when addressed to the legislature, yet courts of justice cannot so far recognize its potency as to make it the basis of their decisions. Whenever a principle of the common law has been once clearly and unquestionably recognized and established, the courts of the country must enforce it, until it be repealed by the legislature, as long as there is a subject matter for the principle to operate upon; and this, too, although the reason, in the opinion of the court, which induced its original establishment, may have ceased to exist. This we conceive to be the established doctrine of the courts of this country, in every State where the principles of the common law prevail. Were it otherwise, the rules of law would be as fluctuating and unsettled as the opinions of the different judges

administering them might happen to differ in relation to the existence of sufficient and valid reasons for maintaining and upholding them. Whatever may have been the original reason for the common law rule, that a legal title to real estate can only be conveyed by deed sealed and delivered, or whatever reason may have existed originally for the distinction between sealed and unsealed instruments and contracts, it would be difficult to assign any other at this day for their maintenance, than the fact that they are long and well settled rules of the common law. The same remark may be predicated of many other fixed and positive regulations of the common law, whose validity no one disputes or controverts. And hence it is, that the courts of every State in the Union, where the common law constitutes a part of their judicial system, governed by such considerations, have declared the existence of the rule in Shelly's case, and have enforced it as rigorously as any other well settled principle of that law; and we are of opinion, that in common with the other principles of the common law, that rule constitutes a part of the judicial system of this State, and must be enforced, unless it has been repealed by some statutory provision.

The counsel for the appellee insist, that this repeal has taken place, and we have been referred to sections 24 and 26 of the act of 13 June, 1822, Hutch. Code, 609, 610, as containing the evidence thereof. By reference to section 24, it will be found, we think, to have little if any bearing upon the question. The object of that section was to abolish entails in both real estate and slaves, whether conveyed by deed or devise; and the proviso contained in the section has exclusive relation to a conveyance or devise of real estate, and cannot, therefore, have any influence upon the construction which must be placed upon a devise or conveyance of slaves. A more difficult question, however, is presented for consideration by the 26th section, which has been mainly relied upon by counsel, and is in the following language: " Every contingent limitation in any deed or will made to depend upon the dying of any person without heirs or heirs of the body, or without issue or issue of the body, or without children or offspring or descendant or other relative, shall be held and interpreted a limitation to take effect when

Powell *v.* Brandon.

such person shall die, not leaving such heirs or issue, or child or offspring or descendant or other relative, (as the case may be,) living at the time of his death or born to him within ten months thereafter, unless the intention of such limitation be otherwise expressly and as plainly declared on the face of the deed or will creating it."

Does this statute repeal the ancient common law rule on this subject? The student who is at all familiar with this branch of the law is well aware that the frequent controversies of which this celebrated rule has been the fruitful mother, had their origin not in any doubt as to the propriety or existence of the rule itself, but whether the words used in the instrument as " heirs, issue, heirs of the body, offspring," &c. were intended as words of limitation, or a designation of a class of persons to take as heirs of the ancestor, or as words of purchase intended to designate particular persons as individuals to take in their own right. The courts at length reached this result; that the words " heirs, heirs of the body, issue, offspring," &c. in their appropriate signification, embraced any heirs of the given description, collectively as a class of persons, unless there was a direct intention plainly and clearly expressed to the contrary; for if that intention clearly appeared, the rule was not so strict as to control that intention, if it steered clear of the reason of the rule or of its literal terms. 1 Preston on Es. 275, 278, 279. But to withdraw a case from the operation of the rule, it was held not sufficient that the intention should depend upon inference or presumable reasons; it had to be manifested by words which were explicit. 1 Pres. on Es. 279. · The numerous cases with which the books abound show the extreme difficulty that existed in ascertaining what words and expressions were sufficient to indicate a direct intention to limit and control the usual meaning which had been given by the court to the foregoing words: " That difficulty," says Preston, " when it arises, does not in any degree question the existence of the rule; it merely raises a doubt on the application of the rule." 1 Pres. on Estates, 279.

To obviate this acknowledged difficulty, and by giving a fixed and positive definition to these words, in consonance with what in most cases seemed to be the wish and intention of the

party using them, and thus to cut off a fruitful source of litigation, occasioned as we conceive the enactment of the 26th section, before referred to.

But we do not think that it was the intention of the legislature to declare, that in every case where the words, " heirs, heirs of the body," &c. were used, that they should be construed as words of purchase and not of limitation, even should it appear from the instrument that such was not the sense or meaning of the party using them. This, we think, is clear from the language of the act itself, which simply declares that these words, when used in the cases referred to, shall have a certain definition or meaning, " unless the intention of such limitation be otherwise expressly and as plainly declared on the face of the deed or will creating it." From this exception contained in the law, the inference seems to be irresistible, that if such intention do so appear, then the words shall not have the meaning or signification affixed to them by the statute, but should receive that definition which the common law affixed to them, and which the party intended to give. In our opinion, therefore, the rule in Shelly's case, so far at least as personal property is concerned, has not been abolished, but still exists in this State, and will be applied whenever it expressly or as plainly appears from the instrument creating the estate, that it was the intention of the grantor, by the use of the words " heirs, heirs of the body, issue," &c. to specify a class or denomination of persons to take the inheritance in succession from generation to generation, in their character as heirs of the ancestor. Does the devise in this case come within this definition?

By the terms of the will, the estate was devised in trust, that Matthew N. Brandon should be put in possession, and " permitted to have, possess, occupy, work, and enjoy the same during his natural life; and in trust, after his decease, to put and continue in possession of the said land and slaves the lineal descendants of the said Matthew N., to the latest posterity." Plainer and more explicit language could not be used to indicate an intention, that the heirs of Matthew N. Brandon, as a class of persons, were to take this inheritance from generation to generation, in and by virtue of their character as his lineal

descendants; and the language here used, but for the 24th section of the act of 1822, before referred to, would have given an estate tail to Matthew N. Brandon. But in consequence of that act, in our opinion, an estate in fee simple vested in him. Do the words of the limitation over contract or change the clear and manifest intention of the testator, as above expressed? The words of the devise or limitation over, are as follows: " And on failure of lineal descendants, then in trust for the heirs generally," &c. No rule was better established than this at the common law. " Wherever an executory devise is limited to take effect, after a dying without heirs or without issue, subject to no other restriction, the limitation is void; for the policy of the law will not suffer property to be tied up and rendered inalienable, in expectation of such remote contingencies." Fearne on Remainders, 444. In our opinion, this principle and policy still exist; and that a limitation over of personal property, to take effect after a dying without heirs, or heirs of the body, or issue, &c., subject to no other restriction, is void, if it clearly appear from the instrument, that by those words was intended an indefinite failure of such heirs or descendants. In this case, the estate was devised in trust for Matthew N. Brandon for life; after his death, in trust " for his lineal descendants to the latest posterity;" and " on failure of lineal descendants, then in trust for the heirs generally," &c. When did the testator intend that this limitation should take effect? Was it, in the language of the statute, when Matthew N. Brandon " should die, not having a lineal descendant then living, or born to him within ten months thereafter"? No. It is expressly declared that it shall take effect whenever " there shall be a failure of lineal descendants of Matthew N. Brandon in the latest posterity," a period of time so indefinite and remote that it might not have taken effect for a hundred or a thousand years; and during the whole of that period of time, the property would have been tied up and inalienable, if the manifest and clear intention of the testator should be carried out. There is no single clause in the will, which, in any degree, tends to remove this irresistible conclusion. Such being the case, is the limitation valid? Most surely not. It is against the principles of the

common law, at war with the settled policy of the State, and, in our opinion, in violation of the spirit, if not the letter, of the 26th section of the act of 1822. Hutch. Code, ch. 42, p. 610.

We have examined the decisions made by this court heretofore on this subject, and do not think that they in the slightest degree conflict with the views here expressed. By reference to those decisions, it will be found, that they were cases in which the conveyance contained no evidence that any other or more enlarged signification or meaning of the words " heirs, heirs of the body, issue," &c., was intended by the party, than that affixed to them by statute. We are, therefore, of opinion, that the slaves in controversy in this case were, by the will of Gerard Brandon, vested in fee simple in Matthew N. Brandon, and are subject to the payment of his debts. At the request of counsel, we have not examined the question, how far the probate court has the power to compel an administrator in a case like the present, to return an inventory of property alleged to belong to the estate.

Let the decree of the probate court of Wilkinson county be reversed, and the cause remanded for further proceedings.

SMITH, C. J., gave no opinion.