ALONZO F. CHESLEY *vs.* BRADBURY F. KING.

Kennebec.    Opinion November 29, 1882.

*Right to water percolating the soil. Digging of well, motive. Injuring water supply of another. Practice.*

One has a legal right to dig a well anywhere on his own land for the purpose of obtaining water for his own use or for the benefit of his estate, and although the effect of it may be to withdraw the water percolating the ground to a spring from which another has the right to take water by an aqueduct, and dry up the spring; the owner of the soil will not be liable to an action on that account, so long as he acts in good faith with an honest purpose. But if he digs the well for the sole purpose of inflicting damage upon the party who has rights in the spring, he will be liable.

Where the jury give damages upon two distinct grounds, and do not return how much was given upon each, the only remedy is to set aside the verdict if it was against law or evidence as to either.

ON REPORT, on motion to set aside the verdict, from superior court.

The writ is dated October 6, 1880; in it the plaintiff alleges that on October 12, 1863, he was the owner of a certain farm, of ninety acres in Mount Vernon, and on that day sold the plaintiff ten acres therefrom, on which there was a valuable spring of living water so elevated and situated that the water from the same would run and could be conducted and conveyed in pipes to his dwelling, barn and pasture, and that in the conveyance he expressly reserved the right and privilege of taking and drawing water from the spring by an aqueduct to his dwelling, barn and pasture, for the use and supply of the same; that in June, 1870, he put an aqueduct into the spring to convey water to his premises and used the same till August, 1879, when the defendant cut off the aqueduct logs; that the plaintiff then run another aqueduct to the spring, when the defendant, "further intending to injure the said Chesley and to deprive him of his said right and privilege in said spring and water, wrongfully and unlawfully opened a well on his said land above said spring, and cut off and turned aside the vein of water supplying the same, diverted said vein of water from its natural course and flow to said spring, so that said spring became dry and useless to the plaintiff, and he was wholly deprived of the privilege and benefit of the same;" and that the defendant "unlawfully and wrongfully and injuriously opened and dug ditches over, through and across the premises of the plaintiff's said logs and pipes in the same to said spring and well, and drew off and subverted the water therefrom and continued such unlawful and injurious drawing and subversion, intending to deprive the plaintiff of the use and benefit of the same and greatly him injure and damage thereby."

The plea was the general issue.

At the trial the jury returned special verdicts that the defendant dug "the well in question and the trench connected with it, for the mere, sole and malicious purpose of diverting the veins of water which supplied the spring in question and not for the purpose of procuring a better supply of water for himself and improving his estate," and that the "defendant was liable for severing and disconnecting the aqueduct on his own land in 1879," and returned a general verdict for the plaintiff, for $52.95.

The deed from Chesley to King of the ten acre lot, contained this clause : "And I, the said Chesley, do reserve to myself the privilege of taking water from a spring on said land by an aqueduct to my house and barn, also to my pasture."

The opinion states the material facts.

*Bean and Beane*, for the plaintiff, contended that the aqueduct and tank made in 1870, was the property of both parties, that they were tenants in common, and therefore the acts of the defendant in 1879, in cutting the logs of this aqueduct were unauthorized and the jury were right in awarding damages to the plaintiff therefor.

The water in the spring was changed in quality and reduced in quantity by the acts of the defendant. The declaration covers this by the words "drew off and subverted the water," etc. To subvert is "to overthrow"; "to ruin utterly"; "to corrupt"; "to destroy". See Webster.

The defendant had no right to cut off the natural channels of water running to this spring, no right to change the underground currents and the cases cited by counsel do not apply to this case.

In all those cases the claim for damages was by one owner of real estate for the act of the adjoining owner done on his own land. Not this case.

The doctrine claimed as applicable to this case amounts to this : A grants to B a valuable right and yet he has the legal power to deprive him at once of the use and benefit of the thing granted by the exercise of a lawful act and upon the land in which the granted right exists and out of which it naturally and necessarily arises. That cannot be good law. *Vickerie* v. *Buswell*, 13 Maine, 289 ; *Ballard* v. *Butler*, 30 Maine, 94 ; *Pillsbury* v. *Moore*, 44 Maine, 154 ; *Winthrop* v. *Fairbanks*, 41 Maine 307 ; *Hammond* v. *Woodman*, 41 Maine, 177 ; *Jordan* v. *Mayo*, 41 Maine, 552 ; *Dolliff* v. *B. and M. R. R. Co.* 68 Maine, 173 ; *Mendell* v. *Delano*, 7 Met. 176 ; *Newell* v. *Hill*, 2 Met. 180 ; *Forbush* v. *Lombard*, 13 Met. 114, 526 ; *Allen* v. *Scott*, 21 Pick. 25 ; *Thayer* v. *Payne*, 2 Cush. 327 ; *Cocheco M. Co.* v. *Whittier*, 10 N. H. 305.

*L. C. Cornish (Joseph Baker* with him,) for the defendant, cited: *Greenleaf* v. *Francis*, 18 Pick. 117 ; Addison on Torts, c. 1, § 1; Angell on Watercourses, § § 95, 114; *Elliot* v. *Fitchburg R. R. Co.* 10 Cush. 193 ; *Pillsbury* v. *Moore*, 44 Maine, 154 ; Wash. Easements, 543, 475 ; *Foley* v. *Wyeth*, 2 Allen, 131 ; *Auburn Company* v. *Douglass*, 9 N. Y. 444 ; *Hunt* v. *Simonds*, 19 Mo. 583 ; *Glendon Iron Company* v. *Uhler*, 75 Pa. St. 467 ; S. C. 15 Am. Rep. 599 ; *Rawstron* v. *Taylor*, 11 Exch. 369 ; *Walker* v. *Cronin*, 107 Mass. 555 ; *Jenkins* v. *Fowler*, 24 Pa. St. 308 ; *Benjamin* v. *Wheeler*, 8 Gray, 409 ; *South Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505 ; *Mahan* v. *Brown*, 13 Wend. 261 ; *Roath* v. *Driscoll*, 20 Conn. 533 ; 25 Conn. 593 ; *Pixley* v. *Clark*, 35 N. Y. 520 ; *Chatfield* v. *Wilson*, 28 Vt. 49 ; *Acton* v. *Blundell*, 12 Mees. and W. 335 ; *Chase* v. *Silverstone*, 62 Maine, 175 ; *Phelps* v. *Nowlen*, 72 N. Y. 39 ; S. C. 28 Am. Rep. 93 ; *Chasemore* v. *Richards*, 7 H. L. Cas. 388 ; *Bliss* v. *Greeley*, 45 N. Y. 671 ; S. C. 6 Am. Rep. 157 ; *Brain* v. *Marfell*, Eng. Ct. of App. in Am. Law Reg. Feb. 1881, p. 93.

BARROWS, J. Damages were claimed by the plaintiff for two acts of the defendant alleged to be wrongful and injurious. I. The cutting off in August, 1879, of certain aqueduct logs lying in the defendant's land and leading from a spring at which the plaintiff had the right and privilege of taking and drawing water by an aqueduct, which aqueduct plaintiff alleges he put into the spring in 1870, for the purpose of supplying his premises. II. The digging a well in the defendant's land above said spring with the malicious intent of cutting off the sources of supply from said spring, the result of which was that it became dry and useless.

It appears by the special findings that the jury affirmed the plaintiff's right to recover on both grounds, and as the amount of damages found upon each is not ascertained, the general verdict must be set aside if either is found to be against law or evidence.

I. Touching the first claim for damages by reason of interference with the aqueduct in 1879. Very clearly the plaintiff did not put those aqueduct logs into the spring. The defendant did it and the assistance which the plaintiff rendered was but trifling.

But the plaintiff claims that under the circumstances it may be regarded as proved that he was an owner in common with the defendant in the aqueduct, and therefore entitled to maintain an action against his cotenant for the destruction of the common property. The jury must have so found, to give the plaintiff damages on this score. We think the finding was manifestly against the evidence. The plaintiff himself does not assert that there was any verbal arrangement even for a common proprietorship in the aqueduct. In the absence of any such arrangement or of any adjustment between the parties so as to equalize the labor and expense of putting in the aqueduct down to the point where it branched off to conduct the water to the respective homesteads, it seems improbable that either party contemplated an ownership of the aqueduct in common. Plaintiff sold the land to defendant in 1863, reserving a right to take water from the spring by an aqueduct to his house, barn and pasture. Up to 1870, neither party seems to have made any use of the spring except to conduct it in a spout two or three rods to the highway where they had a tub for a public watering place, and they shared the abatement of taxes thence accruing equally. For this purpose, shortly after the conveyance, they seem to have been jointly engaged in putting a wooden tank into the spring and laying the spout to the road, and the entire labor and expense was so trifling that, as to that, perhaps it might fairly be inferred that they were willing to let what one did offset what was furnished by the other, without a precise reckoning. But as to the more expensive and laborious job of putting in the aqueduct, years afterwards, it is not credible that they should have had any understanding for joint ownership without either previous arrangement or subsequent adjustment of the cost. The movement to put an aqueduct in the spring originated with the defendant in 1870, and his first plan was to come into the road from his own land. It is easy to see that the plaintiff had a strong interest to induce the defendant, if he could, to build his aqueduct in such a direction that he himself might supply his own premises by merely laying a branch of not more than ten or twelve rods in length, connecting with the defendant's. He did so induce him by suggesting to the defend-

ant that he would find the distance shorter and the digging easier by going through his (plaintiff's) field until he was opposite his own premises, and by promising some little assistance which he rendered and was largely compensated therefor by the use of the defendant's aqueduct down to the point of departure of his own, for eight or nine years and the subsequent abandonment to him of all that part which lay in his own field. But upon the whole evidence it is clear that there was no thought on the part of either of a common ownership in any part of the defendant's aqueduct. Plaintiff in his testimony speaks of it as "his," (defendant's), and not *ours*, and the labor and expense of constructing it was almost wholly borne by defendant. Defendant had a perfect right to discontinue the use of that part of it which went through plaintiff's field when he saw fit, and the verdict of the jury, so far as it gives damages for that act, is manifestly against the evidence.

II. The special finding that defendant dug the well, &c. in 1880, for the mere, sole, and malicious purpose of diverting the veins of water which supplied the spring, and not for the purpose of procuring a better supply of water for himself and improving his estate, is without any sufficient evidence to support it and must have been the offspring of an unreasoning bias or prejudice.

But if damages are recoverable for the *act* without the special finding, it would be idle to set aside the verdict on that account only. We proceed, therefore, to inquire whether there was any wrong to the plaintiff (which is covered by his declaration in this suit) in what the defendant did in the matter of digging the well, etc. in September, 1880. It is necessary throughout our discussion to bear in mind precisely what is charged in the writ as the wrongful act causing damage for which the plaintiff in this branch of the case seeks redress, as well as the evidence offered to support the charge. The plaintiff alleges his rights in the spring and supports his allegations by the production of his deed to the defendant, dated October 12, 1863, containing a reservation of "the privilege of taking water from a spring on said land by an aqueduct to my house and barn, also to my pasture." He alleges that the defendant on September 6, 1880, intending to injure him and deprive him of said right, "wrongfully and unlawfully opened

a well on his said land above said spring, and cut off and turned aside the vein of water supplying the same, diverted said vein of water from its natural course and flow to said spring, so that said spring became dry and useless," and that he "dug ditches, . . . and laid logs and pipes in the same to said spring and well and drew off and subverted the water therefrom."

We do not think these allegations give the defendant any notice that he would be called upon to answer any charge of corrupting the water in the spring. "Subvert" has no such natural signification as applied to material objects like a vein or stream of water, however it may be as to "the minds of the hearers" spoken of in 2 Tim. 2, 14, by which Webster illustrates the definition on which the plaintiff's counsel relies.

The allegations plainly relate to a diversion and consequent withdrawal of water from the spring and nothing more. No evidence could properly be introduced as to the effect produced upon the taste and properties of the spring water by the pipe through which the overflow from the well found its way into the spring. The evidence was received subject to objection, and cannot properly constitute an element of damages under this declaration. Neither does the evidence warrant the conclusion that the defendant, by means of the well and pipes, withdrew water from the spring which had once actually entered it, but only that he diverted that which was percolating through the ground to the spring, to his well and thence to his own premises.

Now touching the alleged claim for damages on account of such withdrawal of water from the spring, we regard it as settled law in this state that any one may, for the convenience of himself or the improvement of his property, dig a well or make other excavations within his own bounds, and will be subject to no claim for damages although the effect may be to cut off and divert the water which finds its way through hidden veins which feed the well or spring of his neighbor. The reasons of the rule have been heretofore so fully discussed that we have no occasion in this connection to do more than cite some of the authorities. *Chase* v. *Silverstone*, 62 Maine, 175 ; *Greenleaf* v. *Francis*, 18

Pick. 117; *Acton* v. *Blundell*, 12 Mees. and Wels. 335; *Broadbent* v. *Ramsbotham*, 11 Exch. 602; *Chasemore* v. *Richards*, 7 H. L. Cases, 349; *Wheatley* v. *Baugh*, 25 Penn. St. 528; *Ellis* v. *Duncan*, 21 Barb. 230; *Delhi* v. *Youmans*, 50 Barb. 316; *Radcliff's Ex'rs* v. *Mayor*, *&c.* 4 Comstock, 200; *Roath* v. *Driscoll*, 20 Conn. 533; and numerous other cases, both in England and this country, where the doctrine is amply discussed and affirmed by courts of the highest character.

As remarked by VIRGIN, J., in *Chase* v. *Silverstone*, "We see less difficulties in applying the rule *cujus solum*, &c. than that of *sic utere*, &c. to cases of this character." Manifestly the plaintiff here can have no greater right by reserving merely an easement in the spring than he would have had if he had excepted from his conveyance the ground in which it stands and a way to it from his own land. He cannot impose a heavier burden upon the property which he conveyed, by this reservation of an easement than he could by an exception of the land covered by the spring.

The same rule applies to cases where one has granted the right to use the waters of a spring, as in the case of adjacent proprietors. *Bliss* v. *Greeley*, 45 N. Y. 671; S. C. 6 Am. Rep. 157; *Brain* v. *Marfell*, Eng. Court of Appeals, given in Am. Law Register, (February, 1881,) N. S. vol. 20, p. 93.

III. Seeing it is settled that this injury of which the plaintiff complains, is, in ordinary cases, where the owner of the adjacent land exercises his paramount right in good faith for his own or the public convenience or advantage, merely *damnum absque injuria* and no proper foundation for an action, the next inquiry is, whether it becomes a good cause of action where the proprietor of the land makes his excavations not for the purpose of accommodating or benefiting himself or others, but merely to do a damage to his neighbor who has some qualified rights in the spring. There is a conflict of authority either in decisions or *dicta* upon this point, — some courts of high standing, notably those of New York, Pennsylvania and Vermont, having said in some of their cases broadly, in substance as in *Glendon Iron Co.* v. *Uhler*, 75 Penn. Stat. 467, S. C. 15 Am. Rep. 599, that

"the commission of a lawful act does not become actionable although it may proceed from a malicious motive."

In view of the very numerous cases where "the commission of a lawful act *does* become actionable" by reason of the mere carelessness of him who does it, when it results in damage to innocent parties, it sounds strangely to say that its commission for the sole purpose of inflicting damage upon another and without any design to secure a benefit to its doer or others, is not actionable when the damage intended is thereby actually caused. We rather incline to the view that there may be cases where an act, otherwise lawful, when thus done may combine the necessary elements of a tort, "an actual or legal damage to the plaintiff and a wrongful act committed by the defendant, "— or in other words may be an invasion of the legal rights of another accompanied by damages. One of the legal rights of every one in a civilized community would seem to be security in the possession of his property and privileges against purely wanton and needless attacks from those whose hostility he may have in some way incurred. We think there is more unexceptionable truth in the statement of the general principle in Com. Dig. Action on the Case, A : "In all cases where a man has a temporal loss or damage by the wrong of another, he may have an action upon the case to be repaired in damages;" and in the remark of the court in *Walker* v. *Cronin*, 107 Mass. 562, thereupon, "The intentional causing of such loss to another without justifiable cause and with the malicious purpose to inflict it, is of itself a wrong."

At all events it is worth while to examine the cases which are cited in support of the proposition above quoted from *Glendon Iron Co.* v. *Uhler*, to see how far the decision rests upon this doctrine, and how far upon other matters.

We think it will be found in most, if not all of them, the case was well disposed of, either on the ground that the plaintiff had not the right or property which he claimed in the subject of the injury, or that the defendant's acts might well be regarded as done not from the sole desire to inflict damage upon his neighbor, but partly at least, from a justifiable, perhaps laudable design, to promote his own advantage or that of others, or protect his own

property from subjection to some servitude by doing acts which, as between himself and the plaintiff, he lawfully might do, — or because for reasons of public policy the plaintiff was precluded from asserting an act to be maliciously done which was within the scope of the defendant's authority or right, and might well be referred to legitimate motives.

The particular case of *Glendon Iron Co.* v. *Uhler, ubi supra,* seems really to have turned upon the point that plaintiffs could have no exclusive right to use a mere geographical appellation as a trade mark, and that the defendant actually manufacturing the same article at the same place was equally entitled to consult his own advantage by using the same name as a trade mark. Where the plaintiff had no property to protect, it is perhaps not strange that the court should refuse to go into an inquiry as to the defendant's motives in doing an act which could not constitute an injury. That there was an admixture of what the law regards as a malicious motive for the defendant's act with other indifferent or laudable designs, could not be expected to confer a right of property on the plaintiff which he did not before possess. The case most relied upon to support the doctrine seems to be *Phelps* v. *Nowlen,* 72 N. Y. 39, and 28 Am. Rep. 93; and as it approaches the case at bar perhaps as nearly in its facts as any other citation on the same side, it should receive careful examination. It presents the case of the withdrawal of a favor which the plaintiff had previously received from defendant in the maintenance of an embankment around a spring on defendant's land, which embankment raised the water in the plaintiff's well. The defendant dug through the embankment with the knowledge that such digging would diminish the water in the plaintiff's well and with the intention to do it; and the case finds "that in so far as such intent and purpose under the circumstances above found can constitute malice, his motive was malicious." But it is difficult to see how the simple withdrawal of a favor which has conferred no vested right to its continuance, can constitute actionable malice. While the court, undoubtedly, *arguendo,* refer approvingly to the doctrine under consideration as laid down very broadly in the cases cited, it is noticeable that it adverts with

satisfaction to the probable existence of a lawful motive, thus: "It may have been lawfully done by the defendant to prevent a diversion of water, the use of which he claimed, and which, if allowed to continue, by lapse of time might ripen into a claim of right by prescription; and hence, although the ostensible object was to diminish water which has been unlawfully appropriated by another, the intent *cannot* well be considered as malicious, or the purpose a wrongful one. That it proves injurious to another is more the fault of the party who reaps a benefit from that which does not belong to him, than of the one who was originally entitled to it and is only claiming his just rights." In further discussion of cited cases, the learned court also advert to the doctrine imported from the civil into the common law, as stated in *Acton* v. *Blundell* and *Chasemore* v. *Richards, ubi supra,* and remark thereon, "The rules last stated may, perhaps, be applied in cases where it is entirely obvious that the act was done solely for the purpose of inflicting a wrong, and with no intention of vindicating a right or preventing a wrong being done to the interests of another." Certainly the support given by this case to the doctrine contended for is somewhat equivocal, and the case seems really to have turned upon the want of any right in the plaintiff, and the probability of lawful and not (properly speaking) malicious motives in the defendant. The same elements are obvious in other cases cited to maintain this questionable dogma.

Thus in *Auburn Plank Road Co.* v. *Douglass,* 5 Selden, 444, the court seem to have held that, in a case of the dedication of his land by a man to the public for use as a way, they would not inquire into his motives, at the instance of the corporation with a charter right to take toll, who alleged malicious injury. The motive might have been charitable and the court apparently would not repress benevolence or public spirit by such an inquiry into its motives. But upon the same facts it was held that equity would restrain the dedicator from keeping his road open in such a way as to enable those who travelled on the plank road to avoid the toll-gate. 12 Barb. 553.

We see no reason why a man should maintain an action against an underwriter or an insurance company for refusing to contract to insure his property because he has injected into his declaration an allegation that the refusal was malicious. Neither law nor equity could compel them to insure the property of those with whom they did not choose to contract. There is a plain lack of right in the plaintiff, and the proposed inquiry into motives is immaterial. *Hunt* v. *Simonds*, 19 Missouri, 583.

The general doctrine of *Walker* v. *Cronin*, 107 Mass. 555, is not what counsel claim, but rather that while a man has no right to protection against competition, he "has a right to be free from malicious and wanton interference, disturbance and annoyance." The *dictum* in *Walker* v. *Cronin*, adverse to this same doctrine as it was shadowed forth in *Greenleaf* v. *Francis*, 18 Pick. 117, seems to be based upon what we conceive to be the erroneous assumption that the owner of a spring has no rights whatever in water percolating through the soil of adjacent proprietors, because his rights therein are assuredly subject to the paramount claims of the owner of the soil, operating in good faith in his own land, "for a justifiable cause."

Why anybody should have supposed that the courts would deem it worth while to indulge a litigious spirit so far as to inquire into the motives of a man who has thrown down fences on his own land, put there to mark the lines of a road never lawfully laid out, is not apparent. Such an immaterial inquiry was properly enough refused in *Jenkins* v. *Fowler*, 24 Penn. St. 308.

. Litigation would be endless if the motives of those who are simply enforcing a legal claim were made the subjects of inquiry. It was rightly held they were not, in *South Royalton Bank* v. *Suffolk Bank*, 27 Vt. 505. And this is in harmony with the doctrine that proof of malice alone, will not support an action for malicious prosecution when there is probable cause. Nor would it be wise as matter of public policy, to throw down the bars which protect public officers from suits for acts done within the scope of their duty and authority, by recognizing the right of every one who chooses to imagine or assert that he is

aggrieved by their doings, to make use of an allegation that they were malicious in motive to harass them with suits on that ground, and it was rightly forbidden in *Benjamin* v. *Wheeler*, 8 Gray, 409. And here we come to the reasons well worthy to be considered, given for the rule in *Phelps* v. *Nowlen*: "A different rule would lead to the encouragement of litigation, and prevent in many instances a complete and full enjoyment of the right of property which inheres to the owner of the soil. . . . Malice might easily be inferred sometimes from idle and loose declarations, and a wide door be opened by such evidence to deprive an ₃owner of what the law regards as well defined rights."

Apparently it is the danger of just such verdicts as that which was rendered in the case at bar, which has induced these courts of high standing, to make a sweeping denial of the right to inquire into motives in such cases as we have been reviewing, where no substantial right of the parties complaining has been infringed.

We are not satisfied, however, that the rule can be maintained as broadly as it has been asserted on this account, and we think there is a still greater danger of its being perverted into a bulwark of oppression and injustice, by the denial of a remedy where a substantial right has been invaded. It seems to us that the denial is broader than the cases required. We think it cannot be regarded as a maxim of universal application that "malicious motives cannot make that a wrong which in its own essence is lawful."

*Chatfield* v. *Wilson*, 28 Vermont, 49, is an authority not to be overlooked, for the instructions of POLAND, J., there considered and condemned, were not substantially different from those given in the case at bar, and the court say: "It may be laid down as a position not to be controverted that an act legal in itself, violating no right, cannot be made actionable on the ground of the motive which induced it,"— apparently assuming that the wanton infliction of damage is not a violation of legal right. Washburn in his Treatise on Easements, &c. has an instructive review of decisions touching this point, (pp. 488–492,

3d ed.) and notices (as do the court in *Phelps* v. *Nowlen*,) the fact that in the later case of *Harwood* v. *Benton*, 32 Vt. 737, the Vermont court remark upon the absence of any imputation of wanton and improper motive as an element in the defendant's liability, and seem purposely to avoid expressing any opinion as to the correctness of *Chatfield* v. *Wilson* on that point.

In commenting upon the general aspect of the question, Washburn says in substance, that courts unequivocally recognize one's right to have his well or spring supplied by underground sources so far as to protect it against invasion by a stranger, and he adds: "It would therefore seem to constitute a something of which *meum* and *tuum* might be predicated, and in regard to which the maxim *sic utere tuo*, &c. would not be wholly foreign, especially when the party destroying it does it by using his property, not for his own benefit, but solely for the purpose of depriving his neighbor of what he would otherwise have rightfully enjoyed."

Upon the whole we are better satisfied with the view of the law on this point which we get from *Acton* v. *Blundell*, *Roath* v. *Driscoll*, *Wheatley* v. *Baugh*, hereinbefore cited, and from *Panton* v. *Holland*, 17 Johns. 92, 98, and from the instructions approved in *Greenleaf* v. *Francis*, 18 Pick. 119, than with that given in *Chatfield* v. *Wilson*.

We think this plaintiff had rights in that spring, which, while they were completely subject to the defendant's right to consult his own convenience and advantage in the digging of a well in his own land for the better supply of his own premises with water, should not be ignored if it were true that defendant did it "for the mere, sole and malicious purpose" of cutting off the sources of the spring and injuring the plaintiff, and not for the improvement of his own estate.

But the testimony is of a character that conclusively negatives the defendant's guilt. The vital facts in the case show that he suffered from a short supply of water now and then during all the years that his aqueduct ran through the plaintiff's land

because the plaintiff's premises were lower than his, and the plaintiff persisted even in dry times in exercising the advantage which he thereby had.. The conclusion upon the whole evidence is irresistible that the defendant, after a long trial, was justified in severing his aqueduct from that which ran to the plaintiff's premises. Upon his doing so, the plaintiff continued his aqueduct as he had a right to do to the spring, and entered it at a point lower than the defendant, and defendant was again deprived of a sufficient supply. There is no testimony which, fairly weighed, can lead to the conclusion that he dug the well for any purpose except to supply the deficiency that he experienced. The special finding on this point is altogether against the weight of evidence and must be set aside.

*Motion sustained. Verdict set aside.*
*New trial granted.*

WALTON, DANFORTH, PETERS and LIBBEY, JJ., concurred.
APPLETON, C. J., concurred in the result.