# CHARLESTON.

### MEDFORD *v.* LEVY.

Submitted June 14, 1888.—Decided Dec. 8, 1888.

1. NUISANCE—ANNOYANCE OF NEIGHBORS—MALICE.

   While certain acts done by a person in the use of his premises as a dwelling-house might not in themselves amount to a private nuisance, yet when the same acts are done wantonly and maliciously for the mere purpose of annoying his neighbor and to destroy the peace and quiet of his home, and they have such effect, they may amount to a nuisance, which a court of equity will restrain. (*p.* 657.)

2. NUISANCE—INJUNCTION—DOMESTIC BROILS.

   Where two families are occupying rooms in the same house, using in common the halls and stairways, a court of equity will not restrain the one from committing a nuisance against the other, unless the proof of the existence of such nuisance is clear and strong. A court of equity will, as far as it can, discourage a resort to its aid for the purpose of interfering in mere domestic broils. (p. 657.)

3. NUISANCE—INJUNCTION—DOMESTIC BROILS.

   He who comes into a court of equity must come in with clean hands; therefore, when there appears to be an unfortunate quarrel between two women, which involves the families of each, and both are in fault, a court of equity will not interfere to protect one against the other and enjoin as a nuisance what one does against the other. (p. 651.)

*Gibson & Michie* for appellants.

*Simms & Enslow* for appellees.

JOHNSON, PRESIDENT :

This is a bill of injunction to restrain a private nuisance. The plaintiffs in February, 1887, presented their bill in va-

cation to the judge of the Circuit Court of Cabell county, in which Thomas Medford alleges, that he is the owner in fee of a three-story brick and stone building in the city of Huntington; that the lower story is used as a business room, and the second story for dwelling-purposes, and the third has not been used for any special purpose ; that on or about the 1st day of November, 1885, the plaintiff, who had occupied the first floor with a stock of queen's-ware, determined to sell or rent the same; that on the 20th of that month he rented to Joseph Levy the store and three rooms on the second floor for a dwelling for one year with the privilege of three years; that said Levy has been occupying the second floor of said building since 1884; that there is a front and rear stairway leading to the second floor and a large hall at the top of the stairways; that himself and wife, a little girl and a house-girl occupy some of the said second story rooms, and the said defendants occupy the others, the stairs and hall being used in common ; that the front room on the east side is used by the plaintiff as a parlor, and three rooms adjoining on the same side are used by them as bedrooms, and they use a building in the rear of the main building as kitchen and dining-room ; that defendants use a room in front on the west side of the building as a parlor and two rooms, one in the rear on the west side as a bedroom, and the other rear room on said floor as a kitchen and dining-room, which last rooms were constructed with two sets of doors, to keep offensive smells from the kitchen from the other part of the house, and that there are also a partition and door across the hallway for the same purpose; that when said doors of the kitchen and hall are kept properly closed, no offensive smells can pass from the kitchen on the second floor into the rooms in front, but all such offensive odors pass out the corridor in the kitchen; that plaintiff's wife had been a great sufferer from neuralgia, is in feeble health and very nervous and excitable, and is now and almost constantly subject to severe attacks of neuralgia, and any unusual noise or confusion produces upon her severe nervous attacks, which require the continual care and attention of the doctor to alleviate her suffering; that during the past two months the defendants have maliciously and wilfully

inaugurated a system of conduct in the use of their rooms for the avowed purpose and object of driving the plaintiff from the rooms, which he and his family occupy, and make living in them impossible; and the defendants threaten to continue their wilful and malicious annoyance, and make the living in said rooms so disagreeable and uncomfortable that, to preserve their health and comfort, they will have to abandon their dwelling-rooms aforesaid, unless defendants are restrained from continuing their malicious and offensive conduct and doings, which are unnecessary and uncalled for in domestic life.

The bill then proceeds to specify the offensive conduct, among them impolite hailing of Mrs. Medford by Mrs. Levy, as, " Good-bye, Sal!" " Hello, Sal!" "Chestnut!" and like sayings; that such remarks are made and persisted in for the purpose of annoying, exciting and maligning the wife of plaintiff, and without any provocation on the part of Mrs. Medford, and that she is thereby annoyed and excited to such an extent as to interfere with their enjoyment of their rooms; that defendants, while their meals are being prepared, instead of keeping the doors closed and allowing the kitchen odors to escape into the outside air,—an arrangement which is amply provided for in the construction of the house,—throw open the doors leading from the kitchen to the hall, thus filling the whole house with objectionable odors, owing to the frequent cooking of cabbage, onions and other things, the odor of which is particularly nauseating to the wife of plaintiff in her present enfeebled and excited condition, and has the effect of making her sick, and rendering her said rooms unfit for the reception of company, and in many other ways interfering with her free and perfect enjoyment of her said rooms, and that the said defendants, although knowing that this can be avoided, persist in these things, for the purpose of annoying plaintiff and his wife; that said defendants are in the habit of throwing old boots and shoes and socks and other objectionable things into the yard, sweeping dirt out of the rooms which defendants occupy into the halls and stairways, and allowing it to remain there a long time, cleaning shoes, shaking clothes, carpets, and rugs in the hall, thereby filling it with dust,

and the floors with dirt, which they do not sweep up and carry away, but allow to remain, thereby adding to the dirt already accumulated; that all these things are very disagreeable, annoying, and insufferable to your said plaintiff, and especially to his wife, whose habits are those of a neat and tidy housewife, and that they are a matter of great embarrassment to her in the presence of visitors; disagreeable smells make plaintiff's wife nervous, bring on attacks of neuralgia, and thereby affect her health, and thereby destroy the peace and comfort of plaintiff's home; that all these acts are wholly unnecessary on the part of the defendants, but that they persist in them on account of their untidy habits, of which plaintiff and his wife were both ignorant before renting the property to said Levy, and also for the purpose of annoying plaintiff and his wife, of making their rooms as uncomfortable as possible, and of causing them finally to vacate the rooms, which they will be compelled to do, unless the defendants are restrained; that instead of passing through the halls quietly, and not making any more noise than necessary, the defendants engage in loud talking, singing and whistling, stamping and dancing in the halls and rooms; that they make excessive and unnecessary noise with coal-buckets and by slamming doors; that these noises are not made from any necessity or even thoughtlessly but for the express purpose of exciting, annoying and vexing and reviling the plaintiff and wife, and, owing to her nervous organization and feeble health, they do annoy, excite and vex plaintiff's wife, and at times completely prostrate her with nervous attacks, and impair her peace of mind, and completely unfit her for her duties, and interfere with plaintiff's enjoyment of domestic life; that they have thrown dirty water out of the windows, purposely spilled water on the stairs, and left it there, annoying the plaintiff and his wife, and damaging his property; that they are in the habit of leaving doors open when they ought to be closed, and closing them when they ought to be open, wiping their feet on the newspaper of plaintiff left at the door, sweeping dirt under doors, and throwing it through transoms over which they have no control, and thereby excessively annoying and irritating plaintiff and his wife, and seriously inter-

fering with their happiness, and the perfect enjoyment and comfort of their home. The prayer of the bill is that defendants *etc.* be enjoined "from doing the acts above mentioned and enumerated, or any one or more of them, or from doing anything else done for the purpose of annoying, exasperating, or reviling your said complainants, or either of them, or in any other manner calculated to disturb them in the full and perfect and quiet enjoyment and comfort of their said home" *etc.*

The injunction was granted in vacation and was as follows: "An injunction is granted the complainants against Joseph Levy and C. Levy, his wife, as prayed for in the within bill, enjoining, restraining, and inhibiting the said Levys, their servants or agents, from making loud, boisterous, and unnecessary noises in the use of the rooms and halls of the tenement now occupied by them on the same floor of the building with the complainants, on the south side of Third avenue, between Ninth and Tenth streets, in the city of Huntington, and, which building is No. 935 Third avenue; and from using scurrilous and offensive language in the presence or hearing of the female complainant, intended or calculated to annoy, disturb, or fret the female complainant; and from leaving open the hall doors during the cooking of meals in the kitchen; and from leaving in the halls and stairways sweepings, dirt, old clothes, or other objectional matter, calculated to offend the sight or smell of the complainants, occupants; and from generally so conducting themselves in the use of the rooms, as to unnecessarily annoy and make the other occupants on the said floor uncomfortable, as complained of in the said bill, until the further order of the court," *etc.*

The injunction was not to take effect, until bond in the penalty of $200.00 was given. The bond was given as required. On the 28th day of March, 1887, the defendants appeared and demurred to the bill for want of equity. The complainants joined in the demurrer, and it was set down for argument. The defendants answered, denying the allegations and charges of the bill. A great number of depositions were taken on both sides, and on the 10th day of January, 1888, the cause was heard on the bill, answer, replica-

tion and depositions, and the court perpetuated the injunction with costs. From this decree the defendants appealed.

The *first* error assigned is, that the court did not act on the demurrer; *second*, that the court erred in not sustaining the demurrer to the bill; and, *third*, that the court erred in perpetuating the injunction.

The court did act on the demurrer by its final decree, because it held the bill sufficient and necessarily overruled the demurrer. Ought the demurrer to have been sustained? It is charged in the bill, " that the defendants have wilfully and maliciously inaugurated a system of conduct in the use of their rooms * * * for the avowed purpose and object of driving the complainants from their rooms, and make the use thereof impossible," and threaten to continue the same. The bill then proceeds to set forth the grievances of complainants.

The current of the authorities seems to be, that if any one does a lawful act on his own property the motive for the act is in law a matter of indifference. *Frazier* v. *Brown*, 12 Ohio St. 294; *Walker* v. *Cronin*, 107 Mass. 564; *Panton* v. *Holland*, 17 Johns. 91; *Mahan* v. *Brown*, 13 Wend. 261; *Phelps* v. *Nowlen*, 72 N. Y. 39; *Chatfield* v. *Wilson*, 28 Vt. 49.

In *Carrington* v. *Taylor*, 11 East 571, it was held, that firing at wild fowl, to kill and make profit of them, by one who was at the time in a boat on a public river or open creek, where the tide ebbs and flows, so near to the ancient decoy on the shore (about 200 yards) as to make the birds there take flight, the defendant having before fired at a greater distance from the decoy, which brought out some of the birds from thence, though he did not fire into the decoy pond, is evidence of a wilful disturbance of and of damage to the decoy, for which an action on the case is maintainable by the owner.

In *Greenleaf* v. *Francis*, 18 Pick. 117, it was held, that in the presence of all rights acquired by grant or adverse use for twenty years the owner of land may dig a well on any part thereof, notwithstanding he thereby diminishes the water in his neighbor's well, unless in so doing he is actuated by a mere malicious intent to deprive his neighbor of water.

In *Trustees* v. *Youmans*, 50 Barb. 316, it was held, that no action will lie for injuries caused by cutting off subterranean waters percolating the soil or running through unknown channels and without a distinct or defined course; but it was further held, that an exception exists in case of an injury done by cutting off such waters with malice; that no person can wantonly and maliciously cut off on his own land the under-ground supply of a neighbor's spring or well without any purpose of usefulness to himself. To the same effect is *Haldeman* v. *Bruckhart*, 45 Pa. St. 514; *Wheatley* v. *Baugh*, 25 Pa. St. 528.

In the well-considered case of *Chesley* v. *King*, 74 Me. 164, it was held, that if an owner of ground should dig a well thereon for the sole purpose of inflicting damage upon a party, who had rights in a spring, he would be liable in damages. The court in that case said: "In view of the numerous cases where the commission of a lawful act does become actionable by the mere carelessness of him who does it, when it results in damage to innocent parties, it sounds strangely to say, that its commission for the sole purpose of inflicting damage upon another, and without any design to secure a benefit to its doer or others, is not actionable, when the damage intended is thereby actually caused. We rather incline to the view, that there may be cases where an act, otherwise lawful, when thus done, may combine the necessary elements of an actual or legal damage to the plaintiff, and a wrongful act committed by the defendant; or, in other words, may be an invasion of the legal rights of another, accompanied by damages. One of the legal rights of every one, in a civilized community, would seem to be security in the possession of his property and privileges against purely wanton and needless attacks from those whose hostility he may have in some way incurred."

Every family possesses under the law the legal right to security in its home; to have peace, quiet and comfort against purely wanton and needless attacks from those, whose hostility they may have in some way incurred. Other families, even those, whose hostility they may have incurred, have also the right to the privileges of a home, the right to talk, even loudly and to sing loudly and dance; to open

and shut doors; and it may be, that they would not always be expected to use great care in the manner of opening and closing doors; to cook their food, and for their comfort to even keep the door of the kitchen open, while the food was being cooked and prepared for the table; but they have no right wantonly and needlessly to do any or all these things in an unusual manner for the mere purpose of annoying and rendering uncomfortable their neighbors; and while under other circumstances the doing of these things in the manner indicated would not amount to a private nuisance, yet, when they are done for the malicious or wilful purpose of annoying a neighbor, and they have such an effect and makes the neighbor's home uncomfortable, the doing amounts to a nuisance.

While there are some things alleged in the bill, as sweeping the dirt into the hall and talking offensively, which would not amount to a nuisance, yet the charge, that, for the mere wilful and malicious purpose of annoying and making uncomfortable the plaintiffs, they by loud talking, singing, and dancing, and permitting offensive odors to escape from the kitchen through doors left open for the purpose, did render the home of the plaintiff materially uncomfortable presents a proper case for the interposition of a court of equity. The bill was sufficient.

Was the decree proper under the pleadings and proof? The case presented here is happily of rare occurrence. No case like it has been cited in the argument of counsel. It is the first case I have ever seen where there was trouble between two private families, originating between the mothers respectively, and a court of equity asked to interfere with its strong arm to protect one against the other. It is to be hoped no such case will again occur; and while, as we have held, the bill presents a case, of which the court under the established principles of equity must take cognizance, yet it would not perpetuate the injunction, unless the proof was clear and strong. The court will discourage, as far as it can, a resort to its power for the purpose of interfering in mere domestic broils. We do not wish the idea to obtain, that, if there is a quarrel between two women, and both become excited and nervous, and things are done and said, which are unseemly, and their domestic peace and happiness is thus

destroyed, either can with ease and dispatch prevail upon a court of equity, which is busy over more weighty matters, to interfere and preserve the peace and quiet of the homes of either.

The proof here shows that these two women had for ten months lived together using the same stairs and hall without trouble, when one wanted to exchange kitchens with the other, which was declined. Then the trouble commenced, and was endured for about two months, when the bill was filed, and the injunction obtained. The plaintiffs were both examined in their own behalf, together with a Miss Worten and a Miss Roberts, girls who had lived with them, and these give evidence which substantially sustains the allegations of the bill, and a Mr. McDowell, who testified to loud singing in the hall, and the doors shut hard; could smell onions cooking, and the smell was disagreeable. He was there on two occasions. Drs. Aldrich, Mayo and Buffington, who attended Mrs. Medford at different times, were also examined. Dr. Aldrich was called in but once. Found her nervous, and in mental distress. Did not know the cause. Dr. Mayo saw her once. Found her in considerable excitement, and she had a severe headache. Did not know the cause. Dr. Buffington went to see her twice. Found her in a very nervous state. Is subject to shortness of breath and palpitation of the heart. Not one of these physicians was asked as to noises and odors in the house. A Miss Via also testified she heard some loud singing by Mrs. Levy. Mrs. Levy was in her own kitchen while singing. Mrs. Burdick, the only other witness for plaintiffs, testified to being at Mrs Medford's on one occasion, and there was a very offensive odor in the hall. Said she could not tell what it smelled like, but thought it was caused by the cooking of kraut. On cross-examination Mrs. Medford and Mr. Medford both admit they said nothing to the Levys about their annoying them by the noise or odors.

Mrs. Levy in her deposition says that she said to Mrs. Medford, before they went there : " Mrs. Medford, consider what you are doing when you give up your kitchen. Remember you are giving up your best and most useful room, and don't repent of it when it is too late." She further said

that, in December, Mrs. Medford came to her, and said: "Mrs. Levy, how would you like to have the rooms down-stairs?" (A small frame building in the yard, which they were using as dining-room and kitchen.) "I asked her what she meant. She said: 'If you will give me your kitchen, I will give you the two rooms down-stairs.'" Mrs. Levy says she afterwards informed her Mr. Levy was not willing to make the change. At this she became very angry, and said it was very inconvenient the way she was situated, and if she had the room she could dispense with a girl, and do her own work. The evidence for the defence shows that, after the disagreement about the kitchen, the trouble grew worse, until it culminated in an encounter between the two women. The Levys in their depositions say Mrs. Medford swept dirt into the hall, and slammed doors; that they cooked as other people, and ate what other people ate; that Mrs. Medford cooked upstairs, with the door open; that it was of no avail to close the kitchen door, for the transom was broken, and could not be shut. They are corroborated by Miss Lavine.

Dr. Mayo says he was called to see Mrs. Levy, and found her suffering from nervous prostration. The women had much trouble about who should clean the halls, *etc.*

John Ran says he is a barber, and lives next door to the Medfords. Said he had heard a little singing, but it was not loud and boisterous.

Dr. Buffington, who was also sworn for plaintiffs, says, at the time he visited Mrs. Medford, he heard no unusual noises coming from Levy's apartments, such as loud singing, whistling, dancing, stamping or slamming doors, as he recollects; that he has no recollection of smelling any bad odors.

A. M. Thomas was an hotel keeper within thirty feet of the Medfords. Said he had heard no unusual noises coming from the apartment of the Levys, such as loud singing, dancing, stamping, or slamming of doors; and that none of his guests had ever complained to him of such noises.

W. A. Gibson said he did business within twenty feet of the Levys, and that he could recall no unusual noises coming from their apartments.

I have referred to this much of the evidence to show the character of this unseemly controversy. There is an old

maxim that he who comes into a court of equity must come with clean hands. Therefore, when there appears to be an unfortunate quarrel between two women, which involves the families of each, and both are in fault, a court of equity will not interfere to protect one against the other and enjoin as a nuisance what one does against the other. The decree of the Circuit Court is reversed with costs, and the injunction is dissolved, and the bill dismissed.

REVERSED.