## COBURN vs. HARVEY and another.

| | |
|---|---|
| 18 | 147 |
| 81 | 617 |
| 18 | 147 |
| 115 | ¹139 |
| 18 | 147 |
| 117 | ¹365 |

The common law, as amended by act of Parliament prior to the American Revolution, is in force in this state, so far as it is applicable to our condition and not modified by our constitution or statutes.

A landlord in this state has the common law right of distress for rent, including the right to sell the chattels distrained.

APPEAL from the Circuit Court for *Grant* County.

Action for damages for personal property alleged to have been wrongfully taken from the possession of the plaintiff by the defendants and converted to their use. The answer denies that the plaintiff was the owner of said property or entitled to its possession, and alleges that it was the property of one Parker; that said Parker was tenant under the defendant *Carns*, under a written lease; that by the terms of said lease certain rents were due, and remained unpaid; that, in order to collect the same, *Carns* caused property to be seized and sold by the defendant *Harvey* under a "landlord's warrant of distress for rent," duly issued by said *Carns*. The plaintiff demurred to the answer, on the ground that under the laws and constitution of this state a landlord has no authority to seize, or to issue his warrant directing any other person or officer to seize, the chattels of a tenant for the failure of such tenant to comply with the conditions of the lease. The court sustained the demurrer; and the defendants appealed.

*Paine & Carter*, for appellants.

*J. A. Barber* and *J. T. Mills*, for respondent. [No argument on file.]

*By the Court*, PAINE, J. This case presents the simple question, whether the landlord's common law right of distress for rent exists in this state. When it was first suggested, the judges of this court were all of the impression that it did not. But an examination of the question has led us to the opposite conclusion.

There is perhaps no rule better established than that which holds that the common law, so far as applicable to our condition, exists in the states of this country, except those whose system was based upon the civil law or some other foreign code. Chancellor KENT says: "But though the great body of the common law consists of a collection of principles to be found in the opinions of sages, or deduced from immemorial

usage, and receiving progressively the sanction of the courts, it is nevertheless true that the common law, so far as it is applicable to our situation and government, has been recognized and adopted as one entire system by the constitutions of Massachusetts, New York, New Jersey and Maryland. It has been assumed by the courts of justice or declared by statute, with the like modifications, as the law of the land in every state. It was imported by our colonial ancestors, as far as it was applicable, and was sanctioned by royal charters and colonial statutes. . It is also the established doctrine that English statutes passed before the emigration of our ancestors and applicable to our situation, and in amendment of the law, constitute' a part of the common law of this country." Kent's Com., Vol. 1, p. 534, 10th Ed.

I have sometimes heard it denied that any part of the common law was in force in this state, though I have never heard the reasoning by which that conclusion was arrived at. The same claim has, however, been made in other states similarly situated, and to show how it has been met I will quote from a few decisions. In *Lorman v. Benson*, 8 Mich., 25, the court says: " Some reference was made on the argument to the general system of law prevailing here in view of the former history of the country; but we deem it useless to enter into any extended examination of this question. It is undoubtedly true that at one time the Custom of Paris was in force here. It was expressly abrogated by the territorial legislature in 1810, and probably applied to very few cases then, if to any. Practically the common law has prevailed here in ordinary matters, since our government took possession; and the country has grown up under it. How or by what particular means it originated, would open an inquiry more curious than useful. A custom which is as old as the American settlements, and has been universally recognized by every department of government, has made it the law of the land, if not made so otherwise. Our statutes, without this substratum, would not only

fail to provide for the great mass of affairs, but would lack the means of safe construction. We are of opinion that qestions of property, not clearly excepted from it, must be deter-. mined. by the common law, modified only by such circumstances as render it inapplicable to our local affairs."

In *O'Ferrall v. Simplot*, 4 Iowa, 399, the court says: " The defendant suggests the further question, whether the complainant would be entitled to dower in this lot if she had not signed the deed. And under this he starts the query whether the common law is the law of this state. This question has been suggested in this court before, but it has not been with apparent seriousness, and therefore it has received no formal answer: and it is not now pressed with an appearance demanding more than a suggestive reply. In the first place, according to our recollection of history, the common law was substituted for the civil by the Missouri Territory, of which this state was once a part. In the next place, so many rights and titles, so great interests have grown up as if by and under the common law, and not by and under the civil, that it would be the duty of a court to hold that the people brought it with them. The territory has from the beginning, including all private rights and titles, been administered upon the basis of the common law ; and to hold that the civil and not the common law is the law of this state, would produce startling and revolutionary effects. The extent and magnitude of the interests involved would require a court to hold to the common law. But besides this, all our laws, back to the beginning of the territory, recognize, assume the common law. They would many of them be unmeaning, senseless without it. All the proceedings of the courts would be so, and not a judgment heretofore recovered would be valid, nor a title under it. But the ordinance of 1787 for the government of the North-west territory, made it the law of that country: and that was extended over Wisconsin, and then the laws of Wisconsin over Iowa. And although the statutes of Michigan and Wisconsin were repealed in 1840,

the ordinance of 1787 was not affected, but remained in full vigor as before."

I have quoted thus at some length from these two decisions, for the reason not only that they are so applicable to the point, but that they were given by courts of states with both of which this state has in a territorial condition been connected. And all that they say about their entire system of laws having from the beginning assumed the existence of the common law, is equally true here. And, as if to remove all pretense for raising this question, our constitution itself expressly assumed the existence of the common law here, and provided that such parts of it as were then in force, not inconsistent with the constitution, should " be and continue part of the law of this state until altered or suspended by the legislature." Art. 14, sec. 13.

In addition to the cases already referred to, the following may be cited as sustaining the general proposition stated at the outset: *Sackett v. Sackett*, 8 Pick., 309 ; *Bruce v. Wood*, 1 Met., 542 ; *Commonwealth v. Churchill*, 2 id., 123–4 ; *Stout v. Keyes*, 2 Doug., 184 ; *Rue High, appellant*, id., 528 ; *Carter and wife v. Balfour's adm'r*, 19 Ala., 814 ; *Ellis v. White*, 25 id., 540 ; *Crouch v. Hall*, 15 Ill., 265 ; *Noonan v. The State*, 1 S. and M., 573 ; *Powell v. Brandon*, 24 Miss. (2 Cush.), 363–4.

It would require considerable hardihood in a court, in the face of such a series of decisions, in the face of the plain implications pervading our system of laws, and in the face of the express assumption in the constitution itself, to hold that no part of the common law is in force in this state.

Assuming then the correctness of the general proposition, that the common law, so far as applicable to our situation, is in force here, the question remains, whether the particular right of distress for rent exists as a part of it. If this were to be determined wholly according to the view which has been taken of it in other states, it would have to be decided in the affirmative. In most of the states its existence has been recognized ; in many of them it has been modified and regulated by

statute; in some it has been superseded by other statutory remedies, of an essentially similar character; and in some, after prevailing for a time, it has been abolished by law.   3 Kent, 472 ; Taylor's Landlord and Tenant, 376.

But we are not left at liberty here to settle this question either according to the action of other states, or what might have been our own views as to its being applicable to our society. The legislative power settled that question while we were in a territorial condition.   The statutes of 1839 expressly recognize the existence of this right, in the act concerning replevin, sec. 20, p. 274; sec. 33, p. 276.   It will be observed that this act did not attempt to provide a right to distrain for rent.   It assumed it as already existing, and regulated only the remedy of replevin where the property had been taken as a distress.   Still the section last referred to did provide incidentally that if the value of the property distrained should not be found equal to the rent due, the party to whom the rent was due might "from time to time distrain again for the residue of such arrears;"— thus recognizing the right and adding new provisions to make it more effectual.   Assuming then that any portion of the common law was in force here in our territorial condition, it would be impossible to exclude the right of distress for rent, after such an express legislative recognition of its existence.   And being then in force, the constitution, the provision of which has already been referred to, took effect upon it and perpetuated it until changed by the legislature.

It will be remembered that in the extract first quoted from Chancellor KENT, he states it as the established doctrine, that English statutes passed before the emigration of our ancestors in amendment of the law, constituted a part of the common law of this country.   A number of the cases already cited hold the same doctrine.   The phrase "the emigration of our ancestors," is too indefinite to establish any fixed time which excluded subsequent English statutes from being considered a part of the common law of some at least of the colonies.

For our ancestors did not all emigrate, nor were the colonies all established, at any one time. And the reason given for adopting the common law with all the statutes amending it prior to a certain time, and excluding statutes passed afterwards, unless expressly adopted, precludes the idea of fixing the same time for all the colonies. That appears in *Sackett v. Sackett*, 8 Pick., where, after showing that the people of that colony brought with them the English statutes passed prior to their emigration, on page 316 the court give the following reason for holding a different rule in respect to those passed subsequently. "Our ancestors *having brought with them* an ample charter for legislation, and having in fact exercised that power as soon as they were organized a body politic, cannot be presumed to have adopted of course all the acts that were afterwards passed in the British Parliament which might alter or amend the common law, but only such as they practically received into their system and which in this manner became their common law." It is very obvious from this that in applying the general principle, each colony would fix the beginning of its colonial existence as the dividing line between those English statutes which were and those which were not a part of its common law.

And we have come to the conclusion that in applying this general rule to a state which, like this, had no political existence before the revolution, it must, in harmony with the reasoning of these cases, be held, that when our territorial legislature and the framers of our constitution recognized the existence here of the common law, they must be held to have had reference to that law as it existed, modified and amended by English statutes passed prior to the revolution. As before shown, there was no one time applicable to all the colonies, and there is no reason to assume that we should adopt the commencement of one colony rather than another as the time applicable to us. The revolution itself is the dividing line which the reasoning of these cases would suggest for us.

This conclusion is stated for the reason that the supreme

court of North Carolina, in the case of *Dalgleish v. Grundy*, Cam. & Nor., 22, where they held that the right to distrain for rent did not exist in that state, based their position chiefly upon the ground that the statute of William & Mary, ch. 5, which gave the right to sell the distress, was certainly not in force there. They did not state why it was not, but it was undoubtedly for the reason given by the court of Massachusetts, that it was passed after the establishment of the colony with a power to legislate for itself. As that statute, however, was passed before the revolution, it constituted, according to the views above stated, a part of the common law relating to distress for rent, which was recognized by our territorial laws, and perpetuated by the constitution until it should be changed by the legislature.

Upon this reasoning we have come to the conclusion that the right to distrain for rent exists in this state. True, it has been seldom exercised, if at all, before this instance. But we cannot for that reason say that it does not exist. In answer to the claim that we should disregard it, we may say, as the supreme court of Mississippi said in answer to a similar claim in respect to another common law rule, "Whenever a principle of the common law has been once clearly and unquestionably recognized and established, the courts of the country must enforce it until it be repealed by the legislature, as long as there is a subject matter for the principle to operate upon ; and this too although the reason, in the opinion of the court, which induced its original establishment, may have ceased to exist. This we conceive to be the established doctrine of the courts of this country, in every state where the principles of the common law prevail. Were it otherwise, the rules of law would be as fluctuating and unsettled as the opinions of the different judges administering them might happen to differ in relation to the existence of sufficient and valid reasons for maintaining and upholding them." 24 Miss., 363.

The judgment is reversed, with costs, and the cause remanded for further proceedings.