HUBER, Respondent, vs. MERKEL, Appellant.

*September 24, 1902—April 17, 1903.*

*Waters: Artesian wells: Rights of owners: Prohibiting waste: Constitutional law: Police power.*

1. The evidence in this case—showing, among other things, that within an area about two and one-half by five miles artesian wells might successfully be drilled and flowing water reached either in a stratum of limestone or in a stratum of sandstone at a depth of about 200 feet, and that when water was reached there was no sudden drop of the drill bit, but it rested on the bottom of the well—is *held* not to sustain a finding that the water in such wells was supplied by a subterranean stream with a defined channel, but to show that it came from percolations through an inclined stratum of pervious rock lying between impervious strata.

2. The owner of land had, at common law, a right to sink wells thereon and use the water from them, supplied by percolation, in any way he chose, or allow it to flow away, even though he thereby diminished the water in his neighbors' wells, and even though in so doing he was actuated by malicious motives.

3. Such right of the landowner is a property right, which cannot be taken away or impaired by legislation, unless by the exercise of the right of eminent domain or by exercise of the police power.

4. Ch. 354, Laws of 1901 (providing that any owner or operator of an artesian well who permits it to discharge more water than is reasonably necessary for his use, thereby materially diminishing the flow of water in any other artesian well in the same vicinity, shall be liable for all damages thereby sustained by the owner of the other well), is not a proper exercise of the police power. In effect it takes private property for private use and without compensation, and is therefore void.

APPEAL from a judgment of the circuit court for Washington county: JAMES J. DICK, Circuit Judge. *Reversed.*

This is an action in equity, brought by the owner of certain real estate, to restrain the defendant, who owns real estate in the vicinity, from wasting or unreasonably using the water from certain artesian wells upon the defendant's land, on the ground that such use interfered with the flow of water from the plaintiff's artesian well, situated on his land. The action was tried by the court, and findings were made in substance as follows: That plaintiff and defendant are farmers and reside upon and own farms within half a mile of each other in the town of Germantown, the plaintiff's farm being about twenty feet higher in elevation than the defendant's. That the plaintiff has an artesian well on his farm, bored in the year 1899, and the defendant has two such wells upon his farm, bored in 1899 and 1900, respectively, which he allows to flow continuously. That within the immediate vicinity of plaintiff's and defendant's farms (and within an area of two and one-half miles wide by five miles in length, which is the only area within which such wells can be obtained) there are thirty such wells, which are owned by farmers and which receive their supply from the same subterranean stream of water, and that each of such wells gave an ample supply of flowing water for ordinary household, domestic, and farm purposes until the defendant maliciously allowed his wells to flow to their full capacity. That the defendant uses some of the water from his wells to supply a fishpond on his land. That he sells some, and intentionally and maliciously wastes the remainder by allowing it to flow and soak into the ground. That the water in the plaintiff's well is affected by the use which the defendant makes of his well, rising when defendant's wells are stopped, and falling when they flow. That the water in all of said wells stands at the same level when they are in a state of rest, and that said subterranean stream is only capable of furnishing sufficient water for ordinary household,

domestic, and farm purposes to those who own the said wells. That the defendant has rendered it impossible for the plaintiff to have any reasonable use of his well, and has compelled him to pump water for his ordinary needs, and that all of the artesian well owners in the vicinity, except the defendant, have so arranged their wells as to regulate their flow.

Upon these facts the court adjudged that the defendant be restrained from wasting the water from his wells and using the same for other than ordinary household, domestic, and farm purposes, and that he so arrange his wells as to prevent the escape of water above the surface of the ground, except when in actual use, and so manage them as not to permit the escape of any more water than is necessary for ordinary household and farm purposes. From this judgment the defendant appeals.

For the appellant there was a brief by *Nath. Pereles & Sons* and *Charles E. Robinson,* attorneys, and *G. D. Goff,* of counsel, and oral argument by *Mr. Robinson* and *Mr. Goff.*

For the respondent there was a brief by *Barney & Kuechenmeister,* and oral argument by *S. S. Barney.*

WINSLOW, J. The principles of the common law regulating the rights of landowners in subterranean waters are well understood. If the waters simply percolate through the ground, without definite channel, they belong to the realty in which they are found, and the owner of the soil may divert, consume, or cut them off with impunity. If, on the other hand, the subterranean waters flow in a defined channel, the rules which govern the use of surface streams apply; but the presumption is that the waters are percolating waters until it is shown that they are supplied by a definite, flowing stream. Gould, Waters, §§ 280, 281, and cases cited. In the present case the trial court found that the water which supplies the plaintiff's and defendant's wells comes from a "subsurface supply and *stream* of water," or, as it is called

in another place in the findings, "a subterranean stream of water." If, as we assume, this finding means a subterranean stream with defined channel, as distinguished from mere percolations through a porous stratum of earth or rock, then the judgment may be sustained upon this ground alone, if such finding is sufficiently supported by the evidence. This, therefore, is the first question to be considered.

It appears by the evidence that in the town of Germantown, Washington county, there is an area about two and one-half miles in width by five miles in length, within which artesian wells may successfully be drilled and flowing water reached at a depth of about 200 feet, and in which there are now about twenty-five such wells, including the wells of the parties; that most, if not all, of these wells when first drilled were flowing wells, but that as more wells have been bored the flow of wells located on higher ground (of which the plaintiff's is one) has become irregular, but that water can always be obtained by pumping; that defendant's wells are in the lower part of the basin, and hence will flow when those on higher ground will not; that nearly or quite all the well owners have caps or plugs on their wells, so arranged as to check the flow when the well is not in use, but that the defendant allows the water to flow freely for the greater part of the time; that when one of the wells in the region is allowed to flow continuously no perceptible effect is immediately observed upon the plaintiff's well, but that after about twenty-four hours of flowing the water begins to recede materially; that when water was struck in defendant's second well the plaintiff's supply began to fall off, and in about three weeks it ceased to flow over the top.

From the testimony of a number of experienced artesian well drillers in the region, one of whom drilled the wells of the parties to this action, it appeared that in most, if not in all, of the wells, water was obtained either in a stratum of limestone or a stratum of sandstone, and that when water was

struck the drill bit rested upon the bottom of the well. There was no evidence that there was any sudden drop of the drill when water was reached.

The foregoing statement covers all the material facts in evidence which tend to throw light upon the sources or nature of the water supply in the Germantown wells. It is impossible for us to see how these facts justify the conclusion that there is any defined subterranean stream which supplies the wells of the parties. The conclusion is irresistible from the facts stated that all the wells draw their supply from a stratum of porous rock, either of limestone or sandstone, which lies in an inclined position and comes to the surface at some distant point, where it receives its water supply; that this porous rock is located between impervious rocks above and below, and probably ends or is cut off at one edge of the Germantown district, thus forming a basin or pocket, which, when pierced by the drill, sends water to the surface in obeyance to natural laws too well known to require statement. Were there any doubt of this conclusion from the evidence, scientific knowledge on the subject of the sources of artesian wells in general, and the artesian wells of Wisconsin in particular, is now so complete and certain as to leave no room for doubt, and of such facts courts may take judicial notice. It has long since become a matter of common scientific knowledge that the ordinary artesian well derives its supply from a pervious stratum of rock imprisoned between two impervious strata of earth or rock, the water-bearing stratum being inclined and coming to the surface at some distant and higher point, called the "intake," where it receives the water, and that the water percolates with greater or less rapidity along and through the inclined stratum, obedient to the law of gravity, until it reaches some obstruction so as to be imprisoned, in which event, if the stratum be pierced, water will rise in a tube by hydrostatic pressure, due to the greater height of the intake. The idea that there are vast subter-

ranean channels or caverns in which artesian waters flow like a river, has been long since abandoned. These are matters of common scientific knowledge. Vol. I, Geology of Wisconsin (Chamberlin) p. 689; U. S. Geological Survey 1885, pp. 125 to 173; Vol. 6, Iowa Geological Survey, p. 127.

Thus in the present case both the evidence and well-established scientific knowledge agree as to the source of the water supply of the wells in question. That source is not a stream or river with defined channel, but an inclined stratum of porous rock which may be many miles in extent, saturated with water which percolates gradually from the intake along and through the stratum until stopped by the termination of the porous formation, where it forms an accumulation. In no proper sense can such water be called a stream with a defined "channel." The word "defined" here means a contracted and bounded channel. Kinney, Irrigation, § 48. It is not meant by this that there must be an open channel or fissure in the rock, through which water flows freely and rapidly, in order that there may be a defined subterranean stream (such channels are rare, if in fact they ever exist), but simply that the water, whether moving slowly or rapidly, and whether passing through sand or gravel or porous rock, must have the characteristics of a stream, in that it has a course and a channel with definite bounds. Such subterranean streams doubtless exist, especially in sandy regions, where surface streams at times disappear and pursue their courses underground for long distances, and finally return to the surface again; but the waters in question in the present case have none of these characteristics, and hence must be held to be strictly percolating waters. An exhaustive discussion of the general subject of the distinction between subterranean streams with defined channels and mere percolating waters will be found in 67 Am. St. Rep. 659, as a note to the case of *Wheelock v. Jacobs,* 70 Vt. 162, and may be consulted with profit.

Counsel for the plaintiff frankly admit that the weight of

authority is that the owner of soil may deal with percolating water as he may see fit, but they claim that there are some modifications of the rule applicable to the present case, and the cases cited in support of this contention will be briefly noticed.    First among these cases are *Bassett v. Salisbury Mfg. Co.* 43 N. H. 569, 82 Am. Dec. 179, and *Swett v. Cutts,* 50 N. H. 439, 9 Am. Rep. 276.    These cases, indeed, reject the principle that a landowner may dispose of percolating water as he chooses, and adopt the principle that the land-owner's right in percolating waters is no greater than his right in running streams; but they stand nearly or quite alone in that position, and it is admitted in the opinion in the first case cited that the great weight of authority is the other way.    We cannot follow them, in the face of the well-nigh universal consensus of judicial opinion to the contrary.    The cases of *Hart v. Jamaica P. A. Corp.* 133 Mass. 488, and *Forbell v. New York,* 164 N. Y. 522, 58 N. E. 644, are also relied on as modifying the general rule.    In the first of these cases a bill in equity was filled, in which it was charged that the defendant, which was a corporation authorized by law to condemn land to enlarge a pond upon its own land and construct a dam thereon for the purpose of accumulating water in the pond for aqueduct purposes, had condemned for that purpose a parcel of the plaintiff's land, the plaintiff still remaining, however, the owner in fee of the parcel and also of adjoining lands and of valuable water rights and privileges immediately below the land so taken; that the corporation had commenced to sink a well and erect powerful pumping machinery upon the land condemned, for the purpose of supplying water to its customers; and that by these acts the plaintiff's lands and water rights would be seriously impaired in value by the tapping and drawing off of the underground sources of supply of said water rights and privileges.    Upon demurrer the bill was held to state a good cause of action. The court said, in substance, that the question was not what

might be the rights of the plaintiff as against an owner of adjoining lands, who, by digging wells or by lawful use of his land, intercepts underground currents of water to plaintiff's injury; this may be *damnum absque injuria.* The defendant is not the owner of adjoining land, but has only an easement therein for certain purposes, the title being in the plaintiff; and its threatened acts are illegal because they exceed its powers, and hence it stands in no better position than a stranger creating a permanent nuisance on the plaintiff's land.

In the second case named it appeared that the city owned two acres of land adjoining certain agricultural lands of the plaintiff, and that it sunk wells and pumped and sold water therefrom, thereby draining the plaintiff's land of its natural water supply, and thereby made it unfit for cultivation and destroyed plaintiff's business. It was held that the rule that the extraction of percolating water was not actionable would be adhered to, but that where adjoining land is impaired for agricultural purposes an injunction should be granted.

It will be noticed that in each of the above cases the court is careful to recognize the principle that the owner of lands may use percolating waters without liability to an adjoining owner. The Massachusetts case in effect holds that the defendant there was not an owner of land and had no right to use the land in that manner, and hence was liable; while the New York case seems to hold that the extraction of underground percolating waters, which simply affects the flow of such waters on adjoining lands, is lawful, but if it impairs the land itself for use in agriculture it is wrongful. Whether the reasoning of the latter case is entirely satisfactory or logical may be doubted, but in any event it is plain that neither case in any way touches the case at bar. In the present case the defendant has sunk a well on land which he owns in fee, and there is no claim that it in any way affects the quality of the plaintiff's land for use in agriculture.

Again, the respondent cites the case of *Greenleaf v. Francis,* 18 Pick. 117, where the principle stated was that a man may lawfully dig a well on his own land where convenient, notwithstanding he thereby diminishes the water in his neighbor's well, unless in so doing he is actuated by mere malice; and, as recognizing the same principle, the respondent also cites *Wheatley v. Baugh,* 25 Pa. St. 528; *Roath v. Driscoll,* 20 Conn. 533; and *Chesley v. King,* 74 Me. 164. This court has recently and distinctly held that the exercise of a property right cannot be affected or curtailed by a malicious motive. *Metzger v. Hochrein,* 107 Wis. 267, 83 N. W. 308.

Lastly, in this connection, the respondent cites two cases from Iowa, viz., *Burroughs v. Satterlee,* 67 Iowa, 396, 25 N. W. 808, and *Willis v. Perry,* 92 Iowa, 297, 60 N. W. 727, as justifying in some degree the contention made here; but on examination of those cases it will be seen that in both of them it was found as a fact that the conflicting wells tapped an underground defined stream of water, and hence they were properly governed by the law applicable to surface streams.

From this brief review of the law and the cases relied upon as modifying the ancient common-law rule as to percolating waters, it seems clear that it must be held that the appellant had a clear right at common law, resulting from his ownership of land, to sink a well thereon, and use the water therefrom as he chose, or allow it to flow away, regardless of the effect of such use upon his neighbors' wells, and that such right is not affected by malicious intent. Whether this right results from an absolute ownership of the water itself, as stated in some of the authorities, or from a mere right to use and divert the water while percolating through the soil, is a question of no materiality in the present discussion. In either event, it is a property right, arising out of his ownership of the land, and is protected by the common law as such.

The respondent, however, relies upon the provisions of ch. 354, Laws of 1901; and it must be admitted that, under

the findings of the court, the judgment in this case is justified by the terms of that law. The first section of the law in question provides that:

"Where there are two or more artesian wells in any vicinity or neighborhood, one or more of which are operated or used by any person or owner, the person or owner of such well shall use due care and diligence to prevent any loss or waste or unreasonable use of any water therein contained or flowing from the same, as would deprive or necessarily diminish the flow of water in any artesian well, to the injury of the owner of any other well in the same vicinity or neighborhood."

The second section provides that:

"Any person who shall needlessly allow or permit any artesian well owned or operated by him to discharge greater quantities of water than is reasonably necessary for the use of such person so as to materially diminish the flow of water in any other artesian well in the same vicinity, shall be liable for all damages which the owner of any such other well shall sustain."

The validity of this act is denied by the appellant on the following grounds: (1) That it deprives the owner of property without due process of law; (2) that it is the taking of property for private use and without compensation; and (3) that it is special legislation. On the part of the respondent it is claimed that the legislature has the right to regulate the manner of using water, and that such regulation does not interfere with vested property rights; also that the act is valid as an exercise of police power.

We have seen from the previous discussion in this opinion that the right of a landowner to divert, appropriate, and use percolating waters as he sees fit has always been recognized by the common law as a right of property attached to the ownership of the soil, and enforced as such. In this state, both by the constitution and judicial decision, it is settled that those parts of the common law which were in force at the time of the adoption of the constitution and were not in-

consistent therewith remained in force until changed by the legislature. Const. art. XIV, § 13. *Coburn v. Harvey,* 18 Wis. 147. The parts of the common law which were in force at the time of the adoption of the constitution, and which have thus been recognized as remaining in force, were such parts as were reasonably applicable to our situation and government. *Coburn v. Harvey, supra.* Where private property rights were founded upon and preserved by any part of the common law so in force, they could not be taken away or impaired by mere legislative enactment, but only for public purposes by the exercise of eminent domain, or by the exercise of the police power for the protection of the public. It is true that in many of the extreme Western states and territories, where mining interests are of the first importance, or where the land is arid or semiarid, on account of deficient rainfall, it has been settled that the common-law rules as to the use of surface streams and subterranean waters do not prevail, and that it is competent for the legislature to provide for the appropriation of surface or subterranean waters for purposes of mining or irrigation; and hence in those states there have grown up, by statute or decision or both, systems of law contravening the rules of the common law as stated in this opinion. *Atchison v. Peterson,* 20 Wall. 507; *Yunker v. Nichols,* 1 Colo. 551; *Reno S., M. & R. Works v. Stevenson,* 20 Nev. 269, 21 Pac. 317; *Jones v. Adams,* 19 Nev. 78, 6 Pac. 442; Kan. Laws of 1891, p. 223 *et seq.,* ch. 133. These systems, however, are all based fundamentally on the proposition that the common-law rules are not applicable to the conditions prevailing in those territories which are widely different from the conditions which prevail in England or in those parts of this country where the rainfall is normal and irrigation is not recognized as a prime necessity. In this state it has never been recognized that any such exceptional conditions prevail as has been held to be the case in the regions mentioned. Moreover, it has been recognized in a long line

of cases, too numerous and familiar to need mentioning, that the common-law rules as to the use and disposition of water have always prevailed. Most of these cases relate to surface streams or surface waters, but in *Case v. Hoffman,* 100 Wis. 314, 75 N. W. 945, the rule as to percolating waters was stated as the undoubted law.

So it seems inevitable that, in this state at least, the right of a landowner to sink wells and gather and use percolating waters as he will, even though the flow in his neighbor's well be diminished, is a property right, which cannot be taken away from him or impaired by legislation, unless by way of the exercise of the right of eminent domain or by the police power.

As the law in question is in no sense a condemnation law, the only question remaining is whether it may be sustained as a proper exercise of the police power. The police power is a broad and comprehensive power, by which the rights of an individual, both as to his liberty and his enjoyment of property, may be curtailed in the interest of the public welfare, but it is not easy of accurate definition. Where laws which are supposed to be enacted in the exercise of the police power interfere with the citizens' liberty or rights of property, they can only be justified upon the ground that they in some manner secure the comfort, safety, or welfare of society. It is on this principle that drainage laws are sustained. *Donnelly v. Decker,* 58 Wis. 461, 17 N. W. 389. And conversely, if it appear from the law itself that its purpose is primarily to benefit private owners, they are condemned. *In re Theresa Drainage District,* 90 Wis. 301, 63 N. W. 288. It must appear that the interests of the public generally require the restriction, and not the interests of private individuals. *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098.

We find ourselves unable to comprehend how, under these principles, the law in question can be sustained as an exercise of police power. It does not even pretend to conserve

any public interest.  Upon its face its purpose is to promote the welfare of one citizen by preventing his neighbor from using his own property.  We are aware that questions of a somewhat similar nature have arisen with regard to laws preventing the waste of natural gas in Indiana, and have received different treatment.  *Townsend v. State,* 147 Ind. 624, 47 N. E. 19; *State v. Ohio Oil Co.* 150 Ind. 21, 49 N. E. 809.  The statutes under consideration in these cases were both criminal statutes; the first declaring the use of natural gas in flambeau lights to be wasteful and extravagant and dangerous to the public good, and making such use a misdemeanor; the second declaring it to be unlawful for any person having possession of any natural gas or oil well to allow the gas or oil to escape into the open air for a longer period than two days after the gas or oil shall have been struck in the well.  The first of the cases above cited was a criminal prosecution under the first of the above-named laws.  A conviction was affirmed, and it is said in the opinion that it was agreed on both sides that the act was an exercise of the police power of the state.  It was further said that the question whether a statute encroaches upon the natural rights of the citizen is a legislative and not a judicial question, and that the courts cannot overthrow it on that ground; also that when the legislature had inquired into the fact, and determined that the burning of natural gas in flambeau lights is waste, that determination is binding on the courts.  Upon these premises the result seems easy to reach, but the difficulty is that the courts of this state do not proceed upon the principle that a legislative determination that an act does not encroach upon the rights of a citizen ends the question and prevents the courts from passing upon it.  In the second of the cases last cited the action was brought by the attorney general, in behalf of the state, to enjoin the defendant from allowing gas to escape into the open air in violation of the second act named. The complaint was voluminous, and showed that a

large portion of the people of the state, and many large manu-
facturing institutions, were dependent upon natural gas for
a fuel supply, and that the state itself and many cities and
counties had equipped their public institutions and buildings
for the use of such gas; that the supply was such that, if hus-
banded and protected, it would last for many years and in-
crease the comfort and happiness of the people at large; that
the defendant had drilled several wells and permitted large
quantities of gas to escape in violation of the law, and threat-
ened to continue such course and to drill other wells and to
allow the gas to escape therefrom; that, if allowed to con-
tinue in such course, the supply of gas upon which the citi-
zens of the state depended would be diminished and finally
destroyed; that the statutory penalties were inadequate; and
that the damage would be irreparable.   Upon demurrer this
complaint was held to state a good cause of action; the ground
being taken that the law was not an unwarranted interfer-
ence with private property, because the gas did not become
private property until reduced to possession, and that the
public interest in the supply of natural gas was so great and
direct that its waste was a public calamity and amounted to a
public nuisance which the state had a right to have abated by
injunction.   It seems clear that, even if the reasoning of these
cases could be fully approved, they do not bear very directly
upon the question before us.   It does not follow that the court
would apply the same rules to subterranean percolating wa-
ters, which are constantly being renewed, that it does to nat-
ural gas, the supply of which is not being renewed. It is to be
noticed, also, that both the laws are framed to protect public
rights and interests, and not private rights, and that both
judgments are based on the ground of great injury to public
comfort, prosperity, and welfare.    The last case cited was
taken to the supreme court of the United States (*Ohio Oil
Co. v. Indiana,* 177 U. S. 190, 22 Sup. Ct. 576), and the

judgment below was affirmed; the reasoning being that the supply of gas in the ground is the common property of all the owners of the surface, and that one of the common owners may rightfully be prevented from wasting the common property to the annihilation of the rights of the remaining owners. However sound this principle may be as applied to natural gas or oil, we have failed to find an authority in the books that holds that percolating waters in the ground are the common property of surface owners. On the other hand, the holdings are unanimous to the effect either that such water is the absolute property of the landowner in whose land it happens to be, or that the right of the landowner to use or divert it while in his land is an absolute right.

Another Indiana case (*Manufacturers G. & O. Co. v. Indiana N. G. & O. Co.* 155 Ind. 461, 57 N. E. 912) is instructive on this subject, because it draws a distinction between natural gas and subterranean waters, which, if well founded, deprives all the foregoing cases on the subject of the control of the use of natural gas of any significance as applied to the use of subterranean waters. This was an action in equity by one property owner against another, in which the complaint alleged that the defendant, by pumping and using other artificial devices in its wells, was increasing the natural flow of gas in its wells, and thus greatly diminishing the pressure in the underlying gas reservoir, and that as a result a great body of salt water would enter the gas reservoir and ultimately destroy the plaintiff's wells. This complaint was held to state a good cause of action. In the opinion the court said that, if gas could be dealt with as subterranean waters, there would be little difficulty in determining the rules by which the rights of landowners should be governed.

"But the difference between natural gas and underground waters, whether flowing in channels or percolating the earth, is so marked that the principles which courts apply to ques-

tions relating to the latter are not adapted to the adjustment of the difficulties arising from conflicting interests in this new and peculiar field."

The court then holds, in substance, that the natural right of landowners in natural gas is simply to use such portion as will by natural laws of flowage rise in their wells and not to increase that flow by artificial means, to the detriment of the flow of others.

Perhaps more time has been spent in reviewing these decisions than is profitable, but the subject is interesting, and we have felt that, owing to the importance of the case before us, they should be given serious consideration. That consideration shows conclusively, as we think, that they have no application to the case of the use of percolating waters. The necessary result of the whole discussion is that the law in question cannot be held to be within the police power, and that it in effect takes private property for private use and without compensation.

*By the Court.*—Judgment reversed, and action remanded with directions to dismiss the complaint.

See *Barclay v. Abraham* (Iowa) 96 N. W. 1080.—REP.