JAMES BARCLAY V. WILSON ABRAHAM AND J. L. SWARTZFAGER, Appellants.

Subterranean Water Course: DIVERSION. A well defined subterranean stream cannot be diverted to the injury of an adjoining landowner.

Subterranean Waters: BURDEN OF PROOF. Subterranean waters are presumed to be percolating unless the supply is shown to be from a known and defined stream, and the burden of proving the existence of such a channel is on those asserting it.

Subterranean Water: RIGHT TO USE. A landowner may make such beneficial use of subterranean percolating water in the improvement of his land as he may desire, but has no right to draw therefrom merely to waste or carry out a design to injure others having the same rights and equal access to the same supply.

*Appeal from Boone District Court.*—HON. J. R. WHITAKER, Judge.

### FRIDAY, OCTOBER 30, 1903.

PLAINTIFF is owner of S. ½ S. W. ¼ of section 10, and N. ½ N. W. ¼ of section 15, township 82 N., of range 25 W. of the fifth P. M. The defendant owns the N. ½ S. W. ¼ of section 10. A run, known as "Big Creek," nearly north and south, passes through both farms to the south. Following the trend of this creek for three or four miles in a northwesterly and southeasterly direction, and about one-half mile wide, flowing wells are obtained at a uniform depth, considering the elevation of the surface. The plaintiff has lived some time on his south eighty at about the center of this district, and several years ago sunk one of the first wells near his house, somewhat above the level of the creek. Later two other wells were sunk, one in the valley of the creek in the north eighty, and the other about thirty rods from his barn, to which an underground pipe was extended to a tank at the barn. In July, 1901, the defendant Abraham put down a three-inch well on his farm near the south line, close to the creek, to which he dug a ditch, and allowed the water to flow unrestrained through the creek to the land below. This resulted in stopping the flow of water from plaintiff's wells at his house and near the barn. In pursuance of a temporary writ of injunction, the flow of defendant's well was reduced to one-fourth of an inch, whereupon water again flowed from plaintiff's well. Upon final hearing the injunction was made permanent, and defendant appeals.— *Affirmed.*

*W. W. Goodykoontz* and *Crooks & Snell* for appellant.

*Charles Whitaker* for appellee.

LADD, J.—The particular district within which flowing wells may be obtained at a depth varying from one hundred to two hundred feet is three or four miles in length by about one-half mile in width, following the direction of the creek. Within this area there are at least eleven wells which are now or have been flowing above the earth's surface. That of plaintiff, near his barn, is one hundred and fifty-two feet deep. The well sunk by defendant is only one hundred and seven feet deep, but on ground about as much lower as the difference. Its casings are three inches in diameter, and the flow, when uninterrupted, has the effect of stopping plaintiff's well and of several others. It is located near the south line of defendant's land, from which the water runs in the creek, and, save that necessary for about thirty head of cattle, is without benefit to him or any one else. The water in excess of a stream one-fourth inch in diameter, to which extent the district court directed him to restrain the flow, is absolutely wasted, and so done without excuse. True, he pretended that the entire flow was essential to prevent clogging with sand or gravel, but the evidence shows conclusively that this was less likely with the smallest available exit. Again, he pretended to have in contemplation the elevation to his tenant's house, across the eighty acres, up some forty feet, of water for domestic use by the operation of a hydraulic ram. But the extent of his preparation therefor was the reading of a circular from some manufacturing company. There was no proper showing that the flow permitted would be inadequate for this purpose, and it conclusively appears that it had nothing to do with his insistency upon utterly wasting the water his neighbors so much needed.

Indeed, the record indicates strongly his object was to
maliciously cut off the water supply of a well
owner other than plaintiff.   In the light of
these facts, it is not very important that we
determine whether the water was supplied by percolation
through the soil or a well-defined subterranean stream.
If the latter, of course the water might not thus be di-
verted.   *Hougan v. Ry. Co.*, 35 Iowa, 558; *Burrows v.
Satelee*, 67 Iowa, 396; *Willis v. Perry*, 92 Iowa, 297.

*1. SUBTERRAN-
EAN water
course:
diversion.*

But the presumption obtains that such waters are per-
colating waters, unless shown to be supplied by a stream
of known and defined channel. ╳Gould on Waters, sections
280, 281; *Hanson v. McCue*, 42 Cal. 303 (10
Am. Rep. 299); *Tampa Waterworks Co. v.
Cline*, 37 Fla. 586 (20 South. Rep. 780, 33 L.
R. A. 376, 53 Am. St. Rep. 262); *Metcalf v. Nelson*, 8 S.
D. 87 (65 N. W. Rep. 911, 59 Am. St. Rep. 746); *Wheatly
v. Baugh*, 25 Pa. 528 (64 Am. Dec. 721); *Huber v. Merkel*,
(Wis.) 94 N. W. Rep. 354.   And it follows that
the burden of proof is upon those asserting right to waters
below the surface, on the ground that they flow in a de-
fined and known channel, to establish the existence of
such channel.   *Black v. Ballymena Com'rs*, 17 L. R. A.
459; *Huber v. Merkel, supra.*   It is to be observed that the
mere existence of the channel is not enough; its location
must be known or reasonably ascertainable. *Lybe's Appeal*,
106 Pa. 626 (51 Am. Rep. 542); *Collins v. Chartiers Valley
Gas Co.*, 131 Pa. 143 (18 Atl. Rep. 1012, 6 L. R. A. 280,
17 Am. St. Rep. 791), where the court concludes that it is
clear, "from the principles and the reasoning of all the
cases, that the distinction between rights in surface and
in subterranean waters is not founded on the fact of their
location above or below the ground, but on the fact of
knowledge, actual or reasonably acquirable, of their exist-
ence, location, and course."   And in *Black v. Ballymena
Com'rs, supra*: "So far the law on the subject is clear;

*2. SUBTERRAN-
EAN waters:
burden of
proof.*

but a difficulty appears still to exist as to the application of this rule by reason of the use of the word 'known' in connection with the word 'defined,' and it does not seem to have been laid down as yet what the nature or extent of the knowledge is which must be proved to exist in order to constitute the riparian relation. It cannot mean that a channel should be visible throughout its course, which would be an impossibility, from the very fact of its being subterranean. In considering the question, the knowledge required cannot be reasonably held to be that derived from a discovery in part by excavation exposing the channel, but must be knowledge by reasonable inference from existing and observed facts in the natural, or, rather, the pre-existing, condition of the surface of the ground. The onus of proof, of course, lies on the plaintiff claiming the right, and it lies upon him to show that without opening the ground by excavation, or having recourse to abstruse speculations of scientific persons, men of ordinary powers and attainments would know, or could with reasonable diligence ascertain, that the stream when it emerges into light comes from and has flowed through a defined subterranean channel." Surface indications of a stream are discussed in *Tampa Waterworks Co. v. Cline, supra,* where surface depressions extended on either side of a spring; in *Hale v. McLea,* 53 Cal. 578, where a line of bushes usually found nowhere except over water courses extended from a spring on adjoining land. See, also, *Saddler v. Lee,* 66 Ga. 45 (42 Am. Rep. 62); *Wheatley v. Baugh, supra;* valuable note to *Wheelock v. Jacobs,* 67 Am. St. Rep. 665. In the instant case surface indications do not aid in locating a stream below. The mere fact that the excessive flow from one well interrupted that of several others did not tend to point out the location, course, or even existence of a subterranean river or smaller water course. *Taylor v. Welch,* 6 Or. 199. A similar result would be as likely to occur when the supply is derived from water filtrating

through the soil until caught in a stratum of sand and gravel lying between impervious layers of other material. See *Huber v. Merkel, supra.* Indeed, the fact that large quantities of sand and gravel are drawn up when the level at which water is reached strongly sustains the latter view. But we need go no farther than to say there is nothing in the record to overcome the presumption that the supply of the entire district is percolating water. If a stream one-half mile wide, it could scarcely be affected by the small outlets afforded by these wells. If a number of narrower streams flow beneath the surface, the location of none has been pointed out nor appears to be ascertainable. *Chase v. Silverstone,* 62 Me. 175 (16 Am. Rep. 419); *Taylor v. Welch, supra*; *Greencastle v. Hazelett,* 23 Ind. 189; *Haldeman v. Bruckhart,* 45 Pa. 514 (84 Am. Dec. 511); *Gould v. Eaton,* 111 Cal. 639 (44 Pac. Rep. 319, 52 Am. St. Rep. 201).

This being true, there is no doubt but defendant had the right to make such beneficial use of the water in the improvement of his land as he might choose. But it does 3. SUBTERRANEAN water: right to use. not follow that he had the right to draw from this reservoir within the earth wherein nature had stored water in large quantities for beneficial purposes merely to waste or carry out a design to injure those having equal access to the same supply. Decisions to the effect that percolating waters are to be treated the same in law as the land in which found, and may be diverted, consumed, or cut off with impunity, without liability for interfering or destroying the supply, are numerous in this country and England—too numererous for citation; but see *Wheatley v. Baugh, supra, Mayer & Aldeman, etc., v. Pickles,* A. C. (1895) 587, and *Frazier v. Brown,* 12 Ohio St. 294. In the last of these cases the principle underlying the right to such waters, and the reasons upon which it rests, were thus stated: "In the absence of express contract and of positive authorized legisla-

tion, as between proprietors of adjoining lands, the law recognizes no correlative rights in respect to underground waters percolating, oozing, or filtrating through the earth; and this mainly from considerations of public policy: (1) Because the existence, origin, movement, and course of such waters, and the causes which govern and direct their movements, are so secret, occult, and concealed that an attempt to administer any set of legal rules in respect to them would be involved in hopeless uncertainty, and would be, therefore, practically impossible; (2) because any such recognition of correlative rights would interfere, to the material detriment of the commonwealth, with drainage, and agriculture, mining, the construction of highways and railroads, with sanitary regulations, building, and the general progress of improvement in works of embellishment and utility.'' An examination of the authorities, however, indicates that they proceed upon the theory that the right thereto relates to the beneficial use of the land, and is connected with its enjoyment for the purposes of agriculture, mining, trade, improvement, and the like. This thought is emphasized by the dicta in many decisions to the effect that percolating waters may not be extracted from the earth to the injury of others merely to gratify malice. Thus, in the leading case of *Wheatley v. Baugh, supra*, the court declared that ''neither the civil law nor the common law permits a man to be deprived of a well or spring or stream of water for the mere gratification of malice. The reason is that water, like air, is of such a nature that no one can have an exclusive right in it. In the process of evaporation and condensation it is sent in refreshing showers all over the earth. In its descent into the ocean it necessarily passes from the one to the other, and is intended for the benefit of all. The right of each is more or less dependent upon that of his neighbor.'' See, also, *Greenleaf v.*

    Vol. 121 Iowa.—40.

*Francis* 18 Pick. 119, where it was held that an owner may dig a well in any part of his land, even though the water in his neighbor's well be diminished, but with this limitation, that in doing so he is not actuated by a malicious intent to deprive his neighbor of water without benefit to himself. The right being conceded, possibly the intent with which exercised would be immaterial. On this point the authorities are in conflict. See *Chesley v. King*, 74 Me. 164 (43 Am. Rep. 569); *Huber v. Merkel*, (Wis.) 94 N. W. Rep. 354.

The important intimation to which we wish to direct attention is that with respect to the beneficial use. A decided tendency to depart from the strict rules of the common law with respect to percolating waters in the adjustment of modern conditions is manifest in recent decisions. In the well considered case of *Stillwater Water Co., v. Farmer*, (Minn.) 93 N. W. Rep. 907, (60 L. R. A. 875), the Supreme Court of Minnesota held that subsurface water might not be drained from his land by an owner merely to pour it into a sewer, when this resulted in depriving a company of the supply from which it furnished the people of a city. There the plaintiff supplied water for domestic purposes to the people of the city of Stillwater from a spring about which it had constructed a wall some six feet in diameter. This was within a few feet from the boundary line between the company's and Farmer's land. Near this line, and not more than ten feet from the center of the spring, Farmer excavated a trench, and placed in it a ten-inch tile drain connected with the city sewer. As a result percolating waters were drawn away from the spring, where they would naturally have gone, materially affecting the supply of water in the spring. Thereupon the company made a change in the outlet and in the mains to guard against such loss; where upon Farmer began to lay his tile at a lower level, commencing at the sewer. A temporary injunction was

granted, and in a well-considered opinion the court held that defendant might not even collect percolating waters merely to squander them to the detriment of his neighbor. The theory of the decision is that, while ownership of the soil extends to the center of the earth, it is somewhat restrained by the maxim, "*Sic utere tuo ut alienum non lædas*." The court directs attention to the fact that in nearly every case where the right to collect or divert percolating waters has been upheld this has been for some beneficial purpose, and pertinently suggests that there is no good reason for not applying the doctrine of correlative rights in such a case, and that such application will not interfere with proper improvement of land, but tend to promote the general welfare of all citizens alike. The rule approved is thus stated: "Except for the benefit and improvement of his own property or for his own beneficial use, the owner of land has no right to drain, collect, or divert percolating waters thereon, when such acts will destroy or materially injure the spring of another person, the waters of which spring are used by the general public for domestic purposes. He must not drain, collect, or divert such waters for the sole purpose of wasting them. Briefly stated, a landowner must not collect and wantonly waste percolating waters, which would otherwise be or have theretofore been appropriated by his neighbor for the general welfare of the people."

The doctrine of correlative rights between landowners respecting the appropriation and use of percolating waters has been broadly applied in New Hampshire (*Bassett v. Salisbury Mfg. Co.*, 43 N. H. 569 [82 Am. Dec. 179]; *Swett v. Cutts*, 50 N. H. 439 [9 Am. Rep. 276]), where the court declared that no good reason could be given why it should not be applicable in all cases where the rights of owners of adjoining lands to collect and use percolating waters are in apparent, though not real, hostility. The courts of New York seem to have held that the owner of land may

not sink wells on his own land from which, by the use of
pumps of potential force and reach, he may drain, the
percolating waters from the premises of his neighbors to
their injury, merely for the purpose of merchandising the
water to consumers distant from the land. *Forbell v.
City of New York*, 164 N. Y. 522 (58 N. E. Rep. 644, 51 L.
R. A. 695, 79 Am. St. Rep. 666). In that case it was said:
"In the absence of contract or enactment, whatever it is
reasonable for the owner to do with his sub-surface water,
regard being had to the definite rights of others, he may
do. He may make the most of it that he reasonably can.
It is not unreasonable, so far as it is now apparent to us,
that he should dig wells, and take therefrom all the water
that he needs, in order to the fullest enjoyment and use-
fulness of his land as land, either for purposes of pleasure,
abode, productiveness of soil, trade, manufacture, or for
whatever else the land as land may serve. He may con-
sume it, but must not discharge it to the injury of others.
But to fit it up with wells and pumps of such pervasive
and potential reach that from their base the defendant
can tap the water stored in the plaintiff's land, and in all
the region thereabout, and lead it to his own land, and by
merchandising it prevent its return, is, however reasonable
it may appear to the defendant and its customers, unrea-
sonable as to the plaintiff and the others whose lands are
thus clandestinely sapped, and their value impaired."
The opinion seems to be grounded upon the notion that
extracting the water by force constituted a trespass, and
the court, apparently in recognizing a departure from
previous decisions, added: "We more readily conclude to
affirm because the immunity from liability which defend-
ant claims violates our sense of justice. It seems to per-
vert just rules to unjust purposes. It does wrong under
the letter of the law, in defiance of its spirit." *Smith v.
City of Brooklyn*, (Sup.) 46 N. Y. Supp. 141, is referred to
approvingly. In that case, upon full consideration, the

court declared that, while waters might be extracted from the depths for the reasonable use or improvement of the land, the law will not allow this to be done for some purpose unconnected with the use, improvement, or enjoyment of the land itself to the detriment of adjoining owners. See same case on appeal (160 N. Y. 367 [54 N. E. Rep. 787, 45 L. R. A. 664]).

It is not necessary to go to this extent in order to sustain the decree in this case. The water from defendant's well, in excess of that allowed him by the court, fell to the earth, and immediately flowed from his land on that of a neighbor below. He proposel to draw the percolating waters, not to supply the people of a great city, but to waste without advantage to any one. In principle the case is like that of *Stillwater Water Co., v. Farmer, supra,* and we are inclined to approve the doctrine therein announced. A contrary conclusion would permit defendant by allowing his well to flow at full capacity, not only to stop plaintiff's well, but every other well in the neighborhood, and this without the slightest benefit to himself. Indeed, this is precisely what he has threatened if interfered with. May one man thus waste the waters stored by nature for the community and wantonly deprive it of their use? Are the courts powerless to remedy such a wrong? The Supreme Court of Wisconsin seems to have so held. *Huber v. Merkel,* (Wis.) 94 N. W. Rep. 354. A distinction between an injury to the quality of the neighbor's land, as in *Forbell v. City of New York,* and to the enjoyment of its use, is suggested, but this is not substantial. See, also, *Hague v. Wheeler,* 157 Pa. St. 324 (27 Atl. Rep. 714, 22 L. R. A. 141, 37 Am. St. Rep. 736). Certainly no good reason can be found for allowing the owner of land to draw sub-surface water therefrom merely to waste, when this results in draining like water from his neighbor's land, to his detriment in its use and enjoyment. Water moves so readily **from one place to**

another that any definite portion of it cannot be said to be the property of the owner of the soil until in some way reduced to control. The water flowing in defendant's well may have been from plaintiff's land or that of some other well-owner a moment previous. In this respect it differs from minerals beneath the surface, and is more like natural gas, which may not be allowed to escape by a landowner, when not made use of, to the detriment of his neighbors. *Ohio Oil Co. v. Indiana*, 150 Ind. 698 (50 N. E. Rep. 1124); *Ohio Oil Co., v. Indiana*, 177 U. S. 190 (20 Sup. Ct. Rep. 576, 44 L. Ed. 729).

Possibly he may waste that on his own land, if he can do so without draining water from his neighbor's. But the source of the supply of percolating waters can seldom be determined, and this is one of the main reasons for permitting its free appropriation by the owner of the soil. A different rule would undoubtedly restrict the use and improvement of land. But the prevention of carrying the water from the land of the owner for the purposes of commerce or waste cannot retard the improvement of the land itself, and there is no just ground for tolerating such diversion when the direct result is to deprive the adjoining landowners by the incidental drainage of their land of a supply of water from the same natural reservoir. This would be extracting the subterranean water from the adjoining land to its injury, without any counter benefit to the land through which taken. This is a stronger case for the interference of a court of equity than *Forbell v. City of New York*. There the drainage rendered the adjoining land unfit for the growth of water cresses, which had formerly been raised upon it; here it destroyed the water supply essential for its customary use and enjoyment. There the drainage was to secure water to distribute to the inhabitants of a great city for profit; here the object was to turn it into a creek to flow unused in any way down to another's land below. The soundness of

some of the reasoning of the *Forbell Case* may well be doubted. The exertion of the force there was in the removal of the subterranean waters in the city's land, and the only suction occasioned was by emptying a cavity into which the water naturally drained from the surrounding country. It is at least exceedingly doubtful whether this constituted trespass. In a lesser degree this happens whenever the sinking of one well has the effect of drying up another. The doctrine of *Smith v. City of Brooklyn*, that the free use of such waters is limited to the improvement, use, and enjoyment of the land from which taken, and cannot be carried away for the purposes of commerce, to the injury of the premises of an adjoining owner, has the better reason for its support. But we need not go this far, even to sustain the decree of the district court, as in the case at bar the owner derived no benefit from the sale or use of the water. As said, the case is in principle like *Stillwater Water Co. v. Farmer, supra*. The doctrine there announced is in harmony with good morals. It interferes with no valuable right of the defendants. It shields from destruction property rights of great value belonging to the plaintiff and others. It goes no farther than to say that a landowner may not collect, drain, or divert waters percolating through the earth merely to carry from his own land for no useful purpose, when such action on his part will have the effect of materially injuring or destroying the well or spring of another, the waters of which are devoted to some beneficial use connected with the land where found. It applies in principle the doctrine of correlative rights to the control of sub-surface waters whenever the appropriation proposed is unconnected with the use, enjoyment, or improvement of the land from which taken.—AFFIRMED.

DEEMER, J., concurs in result.